# *Railex, Inc.*
Colon R. Fulk
**Railway Consultant/Expert Witness**
4305 Pointe Norman Drive * Sherrills Ford, NC 28673
T 828.478.9666 * F 828.478.9660

December 31, 2014

DEFENDANT'S EXHIBIT
Janero vs. NSRC
Colon Fulk – 8
February 4, 2015

Mr. Jeffrey S. Wrage
56 South Washington
Suite 401
Valparaiso, IN 46383

RE: Estate of Janero v. Norfolk Southern Railway Co.

I. **INTRODUCTION**

This report is submitted by Colon R. Fulk, of Railex, Inc. ("Railex"). Railex is a consulting firm specializing in all aspects of train operations.

On September 3, 2011 at approximately 11:30 a.m. Norfolk Southern Railway (NS) train 25AL403 struck an automobile on West High Street in Montpelier, Indiana.

Train 25AL403 was southbound and was occupied by two NS crew members, a conductor and a locomotive engineer. Both crew members were positioned inside the cab of the lead locomotive at the time of the incident. Mr. Mickey Coak, was serving as the locomotive engineer and operating the train. Mr. Coak was positioned at the locomotive control stand located on the right-hand, west side of the locomotive. Mr. Christopher Barnes was serving as the trains' conductor and was seated on the left-hand, east side of the locomotive, at the time of the incident.

The train consisted of 2 locomotives, 35 loaded railcars, 5,768 tons and was 6,615 feet in length. Train speed at point of impact was approximately 53 miles per hour.

The automobile was westbound and being driven by Mr. Rodney Brown. There were three passengers in the vehicle. Ms Angela Brown was positioned in the front seat passenger side, Ms Kristen Janero was in the back seat behind the driver and Xander Janero was located in the back seat passenger side. It was reported by NS they believed that the vehicle approached the track at a slow speed, 2 or 3 miles per hour. A review of crash data indicates in the five seconds prior to the collision, the vehicle slowed from thirty miles an hour to twenty, contradicting NS assessment and the speed of the vehicle, shown in the Railview video.

The crash was described as occurring at a right angle. The right-hand side of the locomotive struck the right rear of the automobile.

EXHIBIT
10

The incident occurred during daylight hours. Weather conditions were described as being 89 degrees Fahrenheit, clear and dry.

All four persons in the vehicle were injured. The two people riding in the back seat died as a result of their injuries. No reports of injury were noted from the NS train crew.

## II. MY BACKGROUND

I have had 33 years of "on board" experience in train operations. From 1972 to 1994, I held various positions with Norfolk Southern Railway ("NS") and its predecessor Southern Railway. These positions included conductor, fireman, brakeman, locomotive engineer, District Road Foreman of Engines, and Division Road Foreman of Engines. From 1994 to 2005 I was a locomotive engineer with Amtrak. I am a Certified Class I Locomotive Engineer and have operated freight trains, local trains, passenger trains and yard engines. In addition to these duties I have investigated derailments, crossing accidents, personal injuries and almost any unusual circumstance involving the operating department of a railroad, including the analyzing of data from locomotive event recorders. I have supervised training and created start-up training programs for railroad employees, including switchmen, trainmen, and engineers. Over my career, I have taken ongoing required and elective training in excess of 2475 hours in such subjects as train handling and operations, railroad management, crew training, operating rules, safety, mechanical, and the like. In 2006, I earned a diploma from the Railway Educational Bureau after completing in excess of 50 lessons pertaining to railroad subject matters.

I am a member of The Air Brake Association and past member of the National Association of Railway Safety Consultants and Investigators (NARSCI). I was the recipient of NS's Special Performance Award for the reduction of personal injuries in my division and have also received Amtrak's Engine Excellence Award. Past member of BLE Safety Task Force, and past Operation Lifesaver presenter.

I have appeared as a witness and given expert testimony concerning such matters as train handling, operation of switches, operation of handbrakes, slack action, rail equipment movement during switching and couplings, and evaluation of railroad employee rule compliance. I have also determined the cause of over 1000 railroad accidents or incidents.

A copy of my resume is attached as Exhibit "A".

## III. THIS ENGAGEMENT

In the course of forming my opinion in this case, I have reviewed the following materials:

1. Deposition of Mike Wilson;
2. Complaint and Jury Demand;

3. Deposition of Christopher M. Barnes;
4. Deposition of Angela Brown;
5. Deposition of Rodney R. Brown;
6. Deposition of Mickey J. Coak;
7. Deposition of Thomas Janero;
8. Deposition of Jeff Jones;
9. Indiana Officer's Standard Crash Report;
10. CDR – Crash Data Retrieval;
11. Coroner's Records;
12. Defendant's Rule 26 (a) (1) Disclosures;
13. Various Photographs;
14. DOT/FRA Highway-Rail Grade Crossing Accident/Incident Report;
15. U. S. DOT – Crossing Inventory Information;
16. Indiana Department of Transportation Division of Muti-Modal Planning & Policy Rail Office;
17. Defendant Norfolk Southern Railway Company's Answers to Plaintiff's First Interrogatories;
18. Norfolk Southern Railway Company's Response to Plaintiff's Request for Production of Documents;
19. Various e-mails & Correspondence;
20. Signal Description & Information;
21. Track Profile;
22. Bulletins & Train Documents – Train 25AL403 - Z11003;
23. Employee History Inquiry – C. M. Barnes;
24. Air-Chime Railroad Whistles – Info;
25. REP's – 1, 2, 5, 9, 13, 14, 20, 25, 27, 29, 46, 47, 51, 53, 54c, 54d, 54d2, 54e, 54f, 54g, 54a, 54b1, 54b2, 59a, 59a2, 59a3, 59a4, 59b, 59b2, 66, 72, 73;
26. NS-1 Rules For Equipment Operation and Handling;
27. Lake Division Northern Region Timetable Number 1;
28. Dearborn Division Northern Region Timetable Number 1;
29. NS System Section Timetable Number 1;
30. U. S. Hazardous Material Instructions For Rail;
31. NS Six Point Action Plan For Safety of Operations;
32. NS Safety and General Conduct Rules;
33. Operations Bulletin No. 1 – Jan 1, 2011 & Various Other Bulletins;
34. NS Operating Rules;
35. Employee History Inquiry – M. J. Coak;
36. Employee History Inquiry – C. M. Barnes;
37. NS System – Complete (FRA) Dispatcher's Records;
38. Locomotive Event Recorder Data Downloaded from NS 9226;
39. Locomotive Event Recorder Data Downloaded from NS 9133;
40. Video Downloaded from On-Board RailView Camera (locomotive NS 9133);
41. Code of Federal Regulations 49, Parts 200 – 299;

## IV. SUMMARY OF GROUNDS FOR EACH OPINION

The grounds for my opinions are based on:
My training, knowledge and experience of the custom and practice of the rail industry as it relates to the specifics of this case:
My railroad working experience while serving in various positions spanning over 33 years for Amtrak, Southern and Norfolk Southern Railway:
The training, knowledge and experience gained while serving as a railroad consultant for Railex, Inc. since 1994:
My review of material and/or information from data thus far:

## V. METHODOLOGY

I use the same methodology that I used during my management years with the Norfolk Southern Railway in determining the root causes of accidents/incidents. To the best of my knowledge, my peers were trained in and used these same methods. The primary goal of the methodology used was to prevent recurrence. Accident investigation is an extremely important component in identifying causes of accidents and what corrective action should be taken to prevent recurrence. Accident causation requires broad considerations of three basic categories: Employee/Behavior, Physical/Environment and Supervision/Management.

Additionally, it may or may not be necessary to perform inspections of the accident scene or equipment. Those inspections may include taking measurements, photographs, preparing sketches and documenting information. Review of documents such as injury reports, witness statements and depositions to determine the sequence of events that led to the accident. Review of regulations, rules standards, practices, policies, etc. that are the custom and practice of the industry, and the requirements of a specific railroad and/or that of the Federal Government:

## VI. OPINIONS

1. **The Norfolk Southern train crew failed to maintain a proper lookout ahead of the train as required by industry standards and their operating and safety rules. As a result of this failure, the train crew negligently failed to warn motoring traffic of its presence and failed to properly take evasive action which could have avoided the collision.**

    A. Norfolk Southern Operating Rules read in part as follows:

**GENERAL NOTICE**

    **Safety is of the first importance in the discharge of duty.**

    **Obedience to the rules is essential to safety.**

J. Working Safely
Employees must not do any work in a manner that will jeopardize their own safety or the safety of others.

## GENERAL REGULATIONS
GR-1. Performing Duties Safely
(a) All employees must follow instructions from proper authority, and must perform all duties efficiently and safely.

## MOVEMENT OF TRAINS AND ENGINES
80. Responsibilities; Movement of Trains and Engines
(a) Crew members must comply with the indication of each signal that affects the movement.
(b) Crew members located in the operating compartment must occupy a window seat when available, and must maintain a vigilant lookout for signals and conditions along the track that affect the movement. Crew members in the operating compartment who cannot avail themselves of a window seat must maintain a vigilant lookout for signals and conditions along the track, within their view, that affect the movement.

## TRAIN SERVICE EMPLOYEES
582. Conductors – Authority and Responsibilities
(a) Conductors have charge of trains to which they are assigned.
(b) They are responsible for:
1. Safe and proper management of their train.
2. Protection and care of passengers and property.
4. Observance and enforcement of all rules and instructions.

B. Norfolk Southern failed to maintain a proper lookout.

Note the deposition testimony of Christopher Barnes, Norfolk Southern Railway Conductor, it reads in part as follow:

Page 15, Line 4;

Q. Do you recall this collision that occurred on September 3, 2011?
A. Yeah, I recall it.
Q. Tell me what you recall from the point of the train being approximately 250 feet back from this crossing to the time of the collision.
A. I was looking down for the split second that it wound up happening for a slow order that we had. It was a speed limit, like some miles just ahead of us to slow, to get to, it's like a speed restriction to the, uh, for the track for some reasons. It could be all kinds of reasons. But they give us orders to tell us speeds and what miles between in the area. And so, at that instant, I was looking at those to make sure we wouldn't be breaking our speed limits up ahead.

Q. So, is it fair to say at the time of the collision, with this vehicle, that you were looking down at the slow order?
A. Yeah.
Q Did you see the motor vehicle at any point prior to the collision with the train?
A. Not that I recall, no.
Q. At any point prior to the collision, did you have the opportunity to apply air to the brake that you had access to?
A. No.

Reviewing train orders certainly does not take priority over maintaining a proper lookout as a train moves over a segment of railroad track. It has been my experience that prudent railroad employees will pick and choose a safe time to review their train orders. It is my opinion this railroad track, as with most railroad tracks, has many locations where a crew member could review their orders when not approaching towns and/or public crossings, where it is expected that people will be crossing their track. During my review of the RailView camera data numerous locations were noted north and south of Montpelier where conductor Barnes could have reviewed his train orders while the train was not approaching a highway grade crossing.

Page 35, Line 15;

Q. From the time you became aware that the collision occurred to the time that the train stopped, did you have any discussion with Mr. Coak?
A. Yeah. I asked what we hit. I asked was it a shopping cart, I remember that, because in towns and stuff, I've hit a lot of loaded shopping carts and they sound very similar to that sound that I heard from the impact of this car. And then he told me, "No, we hit a car."

The aforementioned testimony clearly indicates conductor Barnes did not see the vehicle at any point as it moved towards the crossing. Conductor Barnes was located on the left-hand, eastside, the side of the locomotive from which the vehicle was approaching and he stated that he never saw the vehicle at any time prior to impact. In fact, after impact conductor Barnes asked the engineer what they had hit. Conductor Barnes referred to the split second it wound up happening and at that instant I was not looking. In an apparent attempt to avoid any responsibility to be laid upon Norfolk Southern or its train crew, Conductor Barnes tries to explain that this collision occurred so quickly like some sort of a spontaneous occurrence. This defies logic and the facts of this case.

I have operated trains and supervised the operation of trains a million miles or more and it has been my experience that incidents such as the one in question do not occur in a split second or in an instant. Normally there are events that occur prior to the actual impact that give warning as to what is about to happen, placing operators on notice and enabling them to reduce their reaction time of hitting the horn, reducing speed or hitting the brakes.

6

It is my opinion that conductor Barnes failed to look in the direction of West High Street to observe whether or not any motor traffic existed. This action would have alerted him of the dangerous and unsafe condition of the building hiding traffic flow and the oncoming vehicle. The sight obstructions existing at this grade crossing should have put the train crew on heightened alert as they approached this crossing. This failure inhibited the train crew from taking any evasive action or providing any additional warning to this imminent collision.

The train approached the crossing at 53 miles per hour, roughly 78 feet per second. Conductor Barnes was asked what he recalled from the point of the train being approximately 250 feet back, approximately 3.2 seconds, from this crossing to the time of the collision. He indicated he did not see the vehicle at any point prior to the collision. In my opinion 250 feet is an extremely short distance that a prudent train crew member would begin observing the conditions ahead for a highway-rail grade crossing. In this case, there were events leading up to the actual collision that would have given conductor Barnes reason to believe that an incident could likely occur. It is my opinion conductor Barnes missed those events because he was not looking. It is my opinion had conductor Barnes been attentive to his duties and been looking in the direction of movement he would have had ample time to apply the trains' emergency brake and instruct the engineer to sound the designed horn signal that gives warning to persons on and or near the track and this collision likely would have been prevented. However, no such action was taken, conductor Barnes failed to see the approach of the vehicle at any point prior to impact.

It is my opinion conductor Barnes was extremely negligent and careless in the manner he conducted his duties as a railroad conductor which contributed to cause the 9/3/11 collision. His failure to maintain a proper lookout prevented him from observing the crossing and maintaining a heightened awareness to be ready to slow the train, warn motoring traffic or apply the brakes to avoid a collision.

Note the deposition testimony of Mickey Coak, Norfolk Southern Railway Locomotive Engineer, which reads in part as follows:

Page 13, Line 12;

Q. Did Mr. Barnes ever tell you that he saw that vehicle?
A. **No.**
Q. Do you rely at all upon the conductor in keeping a reasonable lookout?
A. **Yes. Because a lot of engines do have a line of sight that I can't see out of, yes.**
Q. And part of your vision in this engine that you were in is also obstructed inside the cab?
A. **Yes.**
Q. Where was the vehicle located when you hit the e-brake?
A. **Right on the crossing.**

7

Page 19, Line 7;

Q. What made you decide to put the train in emergency?
A. **When I saw them on the crossing.**

Page 28, Line 13;

Q. Is it fair of me to say that if I asked you to put a number 5 on the next time you saw the car was when you stood up and it was on the tracks?
A. **Yes.**
Q. Would you do that for me, please? So you put a number 5 on this copy of Defendant's Exhibit Janero "F", which we will attach to this deposition transcript, and that represents the third time that you saw this motor vehicle. At that point, it was on the tracks?
A. **Yes.**
Q. At the point that you saw it, how far away was the front end of your locomotive? Right there?
A. **On the tracks?**
Q. Literally feet?
A. **Yes, right.**
Q. Literally feet from it?
A. **Yes, feet.**

Page 29, Line 15;

Q. Did you lose sight of the motor vehicle between points 3 and 5?
A. **Yes, at the control stand. I stood up.**
Q. Between any of these points 1 through 5, did Mr. Barnes ever say anything to you that would indicate to you that he ever saw this car?
A. **No.**
Q. At the point that you saw this car at point 5, when it's on the tracks, is that the point that you engaged the e-brake?
A. **Yes.**

Engineer Coak indicated when he last saw the vehicle it was on the track only a few feet in front of the train. Prior to that, he testified he observed the vehicle traveling on the east side of the building along the track, at an alleged "two, three, four mile an hour". As indicated previously, the vehicle, according to crash retrieval data, was probably traveling about thirty miles an hour at the time of Mr. Coak's alleged first observation.

With the obstruction of the building blocking the view of motoring traffic, Engineer Coak should have been placed on heightened alert and maintained a watchful readiness to slow or stop the train. If he would have done so, he would have observed the vehicle emerge from the west side of the building (not traveling "two, three, four mile an hour") and have been in a prepared position to take evasive action (namely hand on horn and throttle or emergency brake to reduce perception reaction time). In addition, if Engineer

8

Coak had actually observed the vehicle on the east side of the building, he should have engaged the horn in a short staccato blast to warn the vehicle of the train's presence, as it would have been unclear at that point if the vehicle was going to stop.

The RailView video clearly shows the vehicle before it came onto the track. It then shows the vehicle as it moved onto the track. Considering the video camera was mounted inside the locomotive cab on the engineer's windshield, it is reasonable to believe the video would give a near visual of what engineer Coak could have seen had he been looking or had he been standing to observe the crossing over his instruments.

I have included two photographs taken from inside a like locomotive (NS 9134) to help illustrate the limited view the engineer had towards the left-hand side, the east side in the direction from which the vehicle was approaching.

The first photograph was taken from the area where the engineer sits while looking forward out the front windshield of the locomotive. Note the control stand to the left of the seat and how it restricts any view to approaching traffic from the left side of the locomotive. It is my opinion this configuration inside the locomotive cab is what engineer Coak was referring to when he talked about relying on the conductor to keep a reasonable lookout.





The second photograph shows the back side of the control stand, the side the conductor would see from his right-hand side as he would look toward the engineer.

The conductor's side of the locomotive would have had a much better view of any highway traffic approaching West High Street from the east as the train traveled south. From the conductor's side of the locomotive he could see forward, out the front windshield, and directly to his left out the side windows. It is my opinion, had he been looking as required by NS rules he would have seen the vehicle approaching the crossing. It is my opinion had conductor Barnes been looking he would have realized that the vehicle was coming onto the tracks and the crew must take preventive measures, i.e., brake application and/or a staccato type horn blast.

Engineer Coak failed to see the approach of the vehicle and did not sound the alarm signal for persons on or near the track. Upon observing the RailView video and based upon my knowledge of visibility of similar type engines, as well as based upon Engineer Coak's admission he did not maintain a watch, it is my opinion that Engineer Coak actually never saw the vehicle he collided with until after the collision occurred. Further, Engineer Coak had the ability, should he have been maintaining proper watch, to have been placed on notice to reduce throttle or apply the emergency brake, to sufficiently enable the vehicle to have crossed the track and avoid the collision.

The fact that the vehicle passed behind a building located so close to the railroad track does not offer an excuse to an engineer or conductor that they believe a vehicle will

stop. Rather, it should and must place them on heightened alert to be observing motoring traffic.

2. **It is my opinion the locomotive horn was not producing the minimum sound level of 96 dB(A) as required by the Code of Federal Regulations at the time of the incident. It is my opinion the level of sound coming from the locomotive horn was not sufficient warning and thereby contributed to the motorist crossing onto the railroad track at West High Street.**

The Code of Federal Regulations 49, Parts 200 to 299 read in part as follows:

**229.129    Locomotive horn**
(a)    Each lead locomotive shall be equipped with a locomotive horn that produces a minimum sound level of 96 dB(A) and a maximum sound level of 110 dB(A) at 100 feet forward of the locomotive in its direction of travel.

I base this opinion in part on the RailView camera data download. During my review of the video it was noted that the horn was clearly heard only one time as the train neared West High Street. That one time was noted as the locomotive passed an adjacent building on the left side of the track. It is my opinion the RailView microphone recorded the one sound as the sound echoed back towards the locomotive while passing the building. This type condition is routine during train operation, the horn sound seems to get louder, at the locomotive, when passing between buildings in close quarters or passing underneath overpasses.

I have reviewed numerous, if not hundreds of similar video downloads from the lead locomotive during train movement. I do take exception to the volume, or lack thereof, of sound recorded on the video downloaded as a result of this incident. Simply put, the horn was just not loud enough. It is my opinion if it had been loud enough it would have been recorded as other sounds were recorded during the train movement.

For example, as mentioned the horn could only be heard as the locomotive passed the building. It is my opinion the microphone was working and able to record. It did record the sound of the crash between the locomotive and the vehicle. It did record the brakes squealing as the train stopped. It did record the bell clanging before and after the train stopped. The recorder even picked-up the sound of the front door being closed at approximate time frame 10:02:48 when a crew member dismounted the locomotive.

It has been my experience and is reasonable to believe a microphone sensitive enough to pick-up the sound of a ringing bell or the closing of a door would certainly record the sound of a locomotive horn blasting as a train approaches a highway-rail grade crossing.

3. **The locomotive engineer did not properly sound the horn as required by Norfolk Southern rules and federal law. This failure contributed to cause the 9/3/11 collision.**

14. Locomotive Horn Signals

14(p) Succession of short blasts — Alarm for employees, roadway workers, other persons, or animals on or near the track.

14. Locomotive Horn Signals

The Engineer is responsible for properly sounding locomotive horn signals required by rule or law.

NOTE: The signals prescribed are illustrated by "0" for a short sound "__" for longer sounds. The sound of the horn should be distinct, with intensity and duration proportionate to the distance signal is to be conveyed.

|  | Sound | Indication |
|---|---|---|
| (L) | __ __ 0 __ | 1. Approaching public highway-rail grade crossing with the engine in front, start whistle signal at least 15 seconds but not more than 20 seconds before occupying the crossing. The signal must be prolonged or repeated until the engine occupies the crossing. |

In fact, engineer Coak was not sounding the locomotive horn as the locomotive entered the West High Street crossing. The RailView download video shows the locomotive horn stopped sounding approximately 2 seconds before the locomotive entered the crossing.

4. **The adjacent building on the east side of the railroad track was a definite sight obstruction.**

It is my opinion NS should have been aware of this building on the east side of the railroad track prior to this collision ever occurring. Engineer Coak passed through this crossing prior to 9/3/11 and should have been put on a heightened awareness every time he passed through this crossing due to the existing sight obstruction. Engineer Coak should have been aware prior to 9/3/11 that this building also impaired the view of an approaching train to a westbound motorist traveling on High Street toward this crossing.

12

For this reason it is my opinion Norfolk Southern should have separated the West High Street highway-rail crossing or restricted train movement when approaching this area which would have prevented the 9/3/11 collision.

These facts and opinions are subject to additional review of material and/or fact finding data.

I hold all of the above opinions with reasonable professional certainty.

Sincerely;

Colon R. Fulk