UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

THOMAS A. JANERO individually, and )    CAUSE NO. 1:13-CV-155-TLS-RBC
THOMAS A. JANERO, personal              )
Representative of the Estates of        )
Christian M. Janero and Xander D.       )
Janero                                  )
    Plaintiffs,     )
           )
vs.                                     )
           )
NORFOLK SOUTHERN RAILWAY                 )
COMPANY                                 )
    Defendant.       )

## AFFIDAVIT OF WILLIAM R. HUGHES

I, WILLIAM R. HUGHES, being first duly sworn upon my oath, depose and state as follows:

1. I am an adult, legally competent to testify, and all matters and opinions stated herein are based on my personal knowledge and are true and accurate to the best of my knowledge and belief.

2. A true and accurate copy of my curriculum vitae is attached as Exhibit "A" to this affidavit.

3. A true and accurate copy of my December 23, 2014 Expert Report is attached as Exhibit "B" to this affidavit.

4. A true and accurate copy of my September 11, 2015 Supplemental Expert Report is attached as Exhibit "C" to this affidavit.

5. I have previously been qualified and testified in numerous State and Federal Courts as an expert witness.

FURTHER AFFIANT SAYETH NOT.



EXHIBIT

tabbies

27

I AFFIRM UNDER THE PENALTY OF PERJURY THAT THE FOREGOING REPRESENTATIONS ARE TRUE.

Date: 4-7-2016

_____
William R. Hughes

STATE OF Virginia )
) SS:
COUNTY OF Botetourt )

BEFORE ME, the undersigned, a notary public in and for said county and state, this 7th day of April , 2016, personally appeared before me, and acknowledged the execution of the above instrument to be his/her voluntary act and deed, for the uses and purposes therein stated.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal the day and year last above written.

_____
Notary Public
Samantha L Joynes
Printed Name
County of Residence: Botetourt
My Commission Expires: 11-30-2020

Samantha L. Joynes
Notary Public
Commonwealth of Virginia
Registration #7673094
My commission expires November 30, 2020

| | |
|---|---|
| THOMAS A. JANERO individually, and ) | CAUSE NO. 1:13-CV-155-TLS-RBC |
| THOMAS A. JANERO, personal ) | |
| Representative of the Estates of ) | |
| Christian M. Janero and Xander D. ) | |
| Janero ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| NORFOLK SOUTHERN RAILWAY ) | |
| COMPANY ) | |
| Defendant. ) | |

## AFFIDAVIT OF WILLIAM R. HUGHES

I, WILLIAM R. HUGHES, being first duly sworn upon my oath, depose and state as follows:

1.     I am an adult, legally competent to testify, and all matters and opinions stated herein are based on my personal knowledge and are true and accurate to the best of my knowledge and belief.

2.     A true and accurate copy of my curriculum vitae is attached as Exhibit "A" to this affidavit.

3.     A true and accurate copy of my December 23, 2014 Expert Report is attached as Exhibit "B" to this affidavit.

4.     A true and accurate copy of my September 11, 2015 Supplemental Expert Report is attached as Exhibit "C" to this affidavit.

5.     I have previously been qualified and testified in numerous State and Federal Courts as an expert witness.

FURTHER AFFIANT SAYETH NOT.

I AFFIRM UNDER THE PENALTY OF PERJURY THAT THE FOREGOING REPRESENTATIONS ARE TRUE.

Date:_____          _____
                                William R. Hughes


STATE OF _____    )
                             ) SS:
COUNTY OF _____    )

BEFORE ME, the undersigned, a notary public in and for said county and state, this _____ day of _____, 2016, personally appeared before me, and acknowledged the execution of the above instrument to be his/her voluntary act and deed, for the uses and purposes therein stated.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal the day and year last above written.

                                _____
                                Notary Public

                                _____
                                Printed Name
                                County of Residence:_____
                                My Commission Expires:_____

Resume for:

## William R. (Bill) Hughes

- Home: 132 Windsor Court, Roanoke Virginia 24019
- Telephone (H) 540/992-6515, (W) 540/966-6003, (C) 540/525-4209

## Personal

- Born August 30, 1948, Married, two grown children

## Military

- USMC, 6/67-7/69, Sergeant E-5, Served in Viet Nam, Honorably Discharged

## Education

- Attended Ohio University, Athens, Ohio
- University of Virginia, Executive Management Series (7/92-4/93)
- Numerous Specialized Law enforcement Courses including FBI Instructor School
- Leadership Roanoke Valley Course (1994)

## Experience

- **Hughes Consulting – 11/06 to Present**
  1. Owner – consulting services and expert witness testimony related to rail safety, security, grade crossings, rail needs assessments, grade crossing inventory, and other railroad related areas. Previous contracts with the Mississippi DOT (four years) and Wilbur Smith & Assoc. (truck route corridor project), and multiple cases as an expert witness nationwide.
     - A. Participated in annual S.C.O.R.T. conferences as both presenter and attendee
     - B. Participate in the every-other year OL Symposium and the intervening year regional seminars as both presenter and attendee
     - C. Attended the National Highway Rail Grade Crossing Safety Conference Training sponsored by the Texas Transportation Institute every other year as both a presenter and attendee
- **Norfolk Southern Railway – 3/73 to 10/06**
  1. Manager Safety, Grade Crossing West – 2/97 to 10/06
     Responsible for grade crossing issues on four operating divisions in ten states. Worked with the state Departments of Transportation, local governments, and elected representatives on grade crossing safety issues covering engineering, education, and enforcement. Managed multiple projects from $5,000 to $11 million.
     - A. Developed first statewide (MS) grade crossing signal corridor project in the railroad industry. Received a quality achievement award for the project.
     - B. Regularly attended the meetings of the Standing Committee on Rail Transportation (S.C.O.R.T.) as both an attendee and presenter
     - C. Became a member of the Operation Lifesaver Boards of Directors in AL, MS, TN,OH, and LA
     - D. Served as a member of the TN Governor's Rail Safety Task Force
     - E. Attended the annual National Highway Rail Grade Crossing Safety Training conference sponsored by the Texas Transportation Institute as both an attendee and presenter
     - F. Participated in numerous Operation Lifesaver trains in several states
     - G. Attended the Southeastern Region Rail Highway Safety Conferences as both an attendee and presenter


EXHIBIT A — PENGAD 800-631-6989

2. Supervisor Safety – 8/95 to 2/97
   Responsible for the Operation Lifesaver Program, various NS safety issues, and safety training on NS' system
   A. Certified as a Level 3 Operation Lifesaver Trainer
   B. Member of the Operation Lifesaver Boards of Directors in GA, NC, VA, OH, SC, IL, and IN
   C. Presenter at the Eighth Annual Region IV Rail Highway Safety Conference in AL
3. Railroad Police – 3/73 to 8/95
   Worked in areas of increasing responsibility attaining the rank of Lieutenant. Certified Police Instructor in Search & Seizure, Laws of Arrest, Drugs & Alcohol and Firearms. Responsible for investigations dealing with vandalism, theft, fraud, internal matters, and the warning, ejecting, and arrest of trespassers.
   A. Developed NS' first Grade Crossing Collision Investigation Course including training eleven NS police instructors. Received a quality achievement award for the project.
   B. Worked on developing a NS video – Off Limits – dealing with trespassing on railroad tracks
   C. Received the Virginia Governor's Safety Award for my work on NS' Grade Crossing Collision Investigation Course
   D. Served as Chairman of the Railroad Section of the Virginia Safety Association's 55th Annual Conference

## Activities

- Duval Lodge #159 F&AM (Past Master, 1979)
- Past Vestry member – St. Augustine's Episcopal Church, Augusta, GA (1985)
- Assoc. of American Railroads – Police Security Section, Past Chairman Region II
- Metro Richmond Chamber of Commerce, Past Chairman – Public Safety Committee (1988 & 1989)
- Virginia State Chamber of Commerce, Criminal Justice & Transportation Committees
- Roanoke Regional Chamber of Commerce, Past Chairman of Transportation Committee (1993 & 1994) and Legislative Committee (1995)
- Served on New Century Council, Past Chairman of Transportation Sub-Committee (1994-95)
- Botetourt County Planning Commission, 10/00-04/14, Chairman (1/05 – 1/07)



# HUGHES CONSULTING

December 23, 2014

Mr. Jeffrey Wrage
Blachly, Tabor, Bozik & Hartman, LLC
56 South Washington, Suite 401
Valparaiso, Indiana 46383

> RE: Estate of Janero v. Norfolk Southern Railway Company
> Case No. 1:13-cv-00155-TLS-RBC

Dear Mr. Wrage:

I have been retained by your firm to offer an opinion in the above titled case. This case is the result of a collision that occurred between a passenger vehicle and a Norfolk Southern freight train on September 3, 2011. This report will summarize my findings based on my training and experience combined with the information you provided and a site visit conducted on December 12, 2014. I reserve the right to amend this report should additional information become available.

I was employed for thirty-two years by Norfolk Southern Railway (Norfolk Southern). The first twenty-two years I worked as a Railroad Police Officer and rose to the rank of Lieutenant. I developed Norfolk Southern's first Grade Crossing Collision Investigation Course and subsequently trained eleven other railroad police officers to teach the course over Norfolk Southern's 22 state system. I received the Virginia Governor's Transportation Safety award for that work. For one year I was the System Manager of Operation Lifesaver and was also involved in employee safety training. I directed the effort of all Operation Lifesaver State Coordinators and was a level III – Operation Lifesaver train the trainer. My last nine years I was the Western Region Manager of Grade Crossing Safety and was responsible for all grade crossing matters on four operating divisions in ten states. I proposed and brought to fruition the railroad industry's first of a kind statewide corridor project in Mississippi which impacted the way railroads approached the closure and signalization of highway-rail grade crossings. My interaction with state Departments of Transportation officials, local, state, and federal officials, the Federal Railroad Administration (FRAP) and the National Transportation Safety Board (NTSB) as well as my attendance at a variety of grade crossing safety conferences and training sessions, both as a presenter and attendee, have provided me extensive knowledge regarding highway-rail grade crossing safety.

1



EXHIBIT
B

The following documents are attached as exhibits to this report:

- CV
- Reference material
- List of previous depositions

## SYNOPSIS:

At about 11:22 AM, EST, on Saturday, September 3, 2011, a 2004 Pontiac Grand Prix driven by Rodney R. Brown was traveling westbound on High Street (DOT #475156L, railroad milepost, 148.97) in Montpelier, Indiana, when it was struck by a southbound Norfolk Southern (NS) freight train (train no. 25AL003). Besides Brown there were three passengers inside the vehicle. The crash resulted in the death of Thomas Janero's pregnant wife Kristen and his infant son Xander.

According to the Indiana Officer's Standard Crash Report, local ID 0111002157, completed by J. Sones of the Blackford County, IN, sheriff's department, the posted roadway speed was 30 mph. However, there is nothing in the crash report to indicate how fast Brown's vehicle was traveling. The DOT/FRA Accident/Incident Report completed by Norfolk Southern (NS) shows the vehicle speed as 2 mph. A report completed by Crash Data Retrieval based on data downloaded from the automobile's event recorder indicates the vehicle was traveling at 20 mph one second prior to the crash. The train was going 53 mph which is under the 60 mph maximum timetable speed.

The crossing is equipped with flashing light signals and an electronic "bell". There is disparity regarding whether or not the flashing lights were operating at the time of the crash and witnesses reported hearing the "bell". Witnesses also reported hearing the train horn prior to the crash but neither Brown nor his wife reported hearing the horn or seeing the activated flashers.

There is no indication drugs or alcohol were a factor for the vehicle driver or train crew.

## BASIC SAFETY PRINCIPLES:

Norfolk Southern Railway (NS) and all class one railroads, as well as many industries across the country, adhere to a concept of basic safety principles, sometimes referred to as system safety, in order to maintain a safe workplace environment. This process is a necessary part of doing business and extensive training and funding are devoted to the workplace safety effort.

The general basic safety principles or system safety approach consists of five key components:

1. The first component is to identify hazards associated with the task(s) to be performed, product, or process being undertaken. In this case we will focus on highway-rail crossings and public safety.

2. The next component in system safety is to develop plans to mitigate those hazards; the methodology used is often referred to as the Fundamental Principles of Safety or the Safety Hierarchy, which was first promulgated by the National Safety Council in the early 1920's. In short, this is a three level hierarchal process: (1) Safety by Design, wherein the system is redesigned so as to either eliminate/minimize the hazard or remove the person from the immediate vicinity of the hazard; (2) Guarding, wherein a barrier or guard is placed between the person and the hazard; and (3) Persuasion Control, wherein techniques such as warnings, training, instructions, and the like are used to "persuade" those that interact with the system to behave in a manner that will minimize the risk associated with the hazard.

3. The next component of system safety is to implement the plan which is done by issuing written instructions and training employees and supervision with respect to the plan. The plan must be enacted and supported from the highest level of management, and communicated down so the entire workforce is included in the process. Effective enforcement of the plan is crucial to its success.

4. The fourth component in system safety is to evaluate the plan to be sure the rules/procedures put in place are being properly implemented and are effective in mitigating the hazard.

5. Documentation is the final component in system safety. One of the important aspects of the documentation component is to ensure all accidents/injuries are thoroughly and properly investigated and evaluated so the plan can be altered/improved to prevent future similar recurrences. A root cause analysis is a critical part of the documentation process. Norfolk Southern understands it is vital to know actual underlying causation and that accidents can have more than one cause.

Unfortunately, NS tends to focus primarily on safety for employees and train movements (workplace safety) with much less attention given to highway-rail grade crossings (public safety). Contrary to the basic tenants of system safety, NS blames the driver for virtually all collisions occurring at highway-rail grade crossings. This approach is adversarial and counterproductive to improving the public safety component of system safety because the railroad neglects to identify the root cause of such horrific collisions. That is exactly what occurred in this case. NS violated these basic safety principles. In this case, the permanent structure at High St. created a sight obstruction

3

for the motorist which made this crossing extra-hazardous. If these safety principles had been followed, High St. should have been closed or upgraded with gates years before. If that had been done, this collision would not have occurred.

## Norfolk Southern Railway and System Safety:

There is no question NS is fully aware of the basic safety principles that make up a good system safety plan. This railroad has an exemplary workplace safety program but falls short where public safety is concerned.

This railroad has a workplace safety plan for derailment prevention, employee safety, and the prevention of train-train accidents. There are safety rule books, operating rule books, departmental policies and procedures, timetables, and dispatcher's bulletins all designed to prevent workplace injuries and provide for the safe operation of the railroad. For twenty-two years in a row the railroad was recognized as the industry leader in having the fewest number of reportable injuries and was awarded the E. J. Harriman award for its effort.

NS extensively investigates workplace accidents and understands a root cause analysis is critical to preventing future accidents. Unfortunately, the same criteria do not apply to highway-rail grade crossing collisions - public safety. There is no root cause analysis of crossing collisions and NS simply blames the driver. It has not learned from reviewing previous grade crossing accidents or the extensive studies and publications available regarding highway-rail grade crossing safety. NS knows what to do, it just doesn't. The railroad's failure to treat public safety with the same time and attention it gives workplace safety demonstrates its disregard for the motoring public. This case clearly exemplifies NS' ongoing disregard for public safety. If NS had performed a root cause analysis in this case, it would have identified the visual obstruction which contributed to cause this collision.

## Norfolk Southern's Public Safety Effort:

On October 8, 1993, then chairman David Goode, wrote a letter to the upper management of NS wherein he stated "Grade crossing accidents are also a leading cause of damage to Norfolk Southern property and delay to NS trains. For the last several years, NS consistently has had the highest number of crossing accidents and the worst rate of such incidents among major railroads. This is not acceptable for NS'. In the letter Goode states "As railroaders, we all should be active participants in grade crossing safety – as we are in all aspects in safety". This clearly shows Goode recognized there is a different approach between workplace safety and grade crossing safety.

4

As a result, corporate policy 963 was issued on October 29, 1993, and the System Grade Crossing Oversight Committee was charged with the administration of reducing highway-rail grade crossing collisions. This policy authorized the use of company funds if necessary to mitigate hazardous conditions. The policy stated "it is in the public interest and the corporation's to participate actively in identifying hazardous conditions, making such conditions known to government officials and implementing appropriate corrective measures". Also, "All NS employees are expected to be active participants in our grade crossing safety efforts and may be called upon for assistance at any time. In particular, Operations Division Safety Teams and individual personnel are responsible for identifying conditions which could interfere with the ability of a motorist to appreciate the potential hazard of an approaching train".

In 1996 the Grade Crossing Safety Department was formed to further pursue the reduction of grade crossing collisions and the elimination of redundant crossings. The department was tasked with working with the operating divisions, state departments of transportation, and local and state elected officials to achieve the corporate goal of reducing the number of grade crossing incidents.

Corporate Procedures 400, 400.1, 400.2, and 400.3 were written to govern the way the Grade Crossing Safety Department operated. Those procedures have been amended from time to time but are still in effect.

Policy 400 sets forth the railroad's corporate position on grade crossing safety and its willingness to work with states to develop closures and crossing improvements. It also states the railroad is willing to use its own funds to bring projects to completion. The policy establishes the Grade Crossing Safety Group, with oversight from the System Grade Crossing Oversight Committee, as the principal liaison between the railroad's departments and government entities to identify projects. Procedure 400.1 provides guidelines for the formation of Division Grade Crossing/Trespass Safety Committees. Those committees are tasked with hy-railing various line segments to inspect grade crossings, identify unsatisfactory conditions at those crossings, and developing solutions to those conditions. The appropriate department/employee is to be assigned the responsibility of correcting the noted conditions and is to report back to the committee the action taken. Procedure 400.2 further details the responsibility of the Division Grade Crossing/Trespass Committee to identify unsatisfactory conditions. Remedies are to be proposed solutions pursued both within NS and with outside governmental authority. This procedure more specifically identifies departmental responsibilities. Procedure 400.3 sets forth guidelines for NS' involvement with Operation Lifesaver.

There is no evidence any hy-rail trip was ever conducted over the line segment on which High St. is located. There is no indication any employee of any of the departments represented on the Division Grade Crossing/Trespasser Safety Committee identified the sight obstruction at High St. and as a result nothing was done to correct

the problem. There is nothing in the file to indicate any Operation Lifesaver program was presented in Montpelier or any crossing blitz conducted at High St.
Operation Lifesaver also conducts a Grade Crossing Collision Investigation Course for police departments and first responders. Again, there is nothing in the file to indicate any such program was ever conducted in Montpelier or Blackford County. The investigating officer, Jeff Sones, never testified to receiving any such training or having knowledge such training existed.

NS failed to follow its own policy and procedures. If it had, High St. would have been closed or upgraded and this tragedy prevented

### High Street, DOT #475156L

High Street is a local two lane road in Montpelier, IN, with an average daily traffic count (ADT) of 170 cars (2002 count). The roadway is brick from the crossing to the next intersecting road on each side, Jefferson St. to the east and Grant St. to the west. The U.S. DOT – Crossing Inventory Information records at the time of the crash show there were 28 trains a day over the crossing with a maximum timetable speed of 60 mph. The information in the Crossing Inventory is provided to the Federal Railroad Administration (FRA) by both the railroad and the state whenever a change is made to the crossing or the roadway characteristics.

Those same Inventory records for the period of 4/1/1986 to 3/8/1988 indicate the crossing was equipped with one cantilevered signal. A cantilever signal extends over one lane of the road and is equipped with a flashing red light and a bell. The report does not show on which side of the crossing the signal was installed. The inventory report from 4/15/1997 to 6/12/2002 was changed to show there were two mast mounted flashing lights at the crossing implying the cantilever signal was replaced by the flashing lights.

This data conflicts with documents in the file, RFP-2 and RFP-5. Those records show in 1983 NS approached the town of Montpelier regarding a speed increase from 40 mph to 60 mph. The town was in agreement provided NS replaced the outdated wig-wag signals with more modern flashing light signals. NS agreed to the proposal and completed an AFE to fund the project using 100% railroad money (RFP-2). A document in RFP-5 shows flashing light signals were placed in service on November 21, 1988. There is no explanation for why the signals were in service in 1988 but not properly listed on the Inventory Report until 1997. This reflects NS' attitude toward accurate reporting even though it knows the priority rankings depend on the information reported. It's logical to conclude the speed increase took place soon after the flashers were put into service but that increase was not changed on the Inventory Report until 2002; another indication of inaccurate NS reporting.

The crossings on either side of High St., Windsor St. to the north (DOT #475157T) and Huntington St. to the south (DOT #475155E), are equipped with gates, lights, and bells. Huntington St. is also equipped with cantilever signals. The DOT Inventory Reports show both of these crossings had mast mounted flashing lights on 12/1/1976, the earliest dated Inventory Report for High St. It's likely the flashing light signals were installed prior to that date. Based on the Inventory Report, Windsor was upgraded to gates in April 1997 and Huntington was upgraded in 1985.

FRA records show no collisions at Windsor St., one at Huntington St. (2014), and only one at High St., the subject collision. Over time Huntington St. had a significant increase in ADT which would justify the signal upgrade at that location. The feed mill at Windsor creates a similar sight obstruction to the structure at High St. so it's reasonable to think if the conditions are the same at both crossings, both should have been upgraded. The flashing light portion of the signals, the roundels, at the time of the crash were eight inch roundels. They were the same size when I conducted my site visit on December 12, 2014. Twelve inch roundels are considered more visible and the preferred industry choice. NS should have upgraded the roundels on the High St. signals long before this collision occurred.

Typically federal funds (Section 130) are used to pay for installing signals at a crossing. Those funds are administered by the state DOT and are allocated according to the state's crossing priority ranking developed by using an accident prediction formula developed by the FRA. However, railroads have the ability to install signals using their own money as NS did with the flashing light signals at High St. in 1988. Further, before federal funds are allocated to a signal project, a diagnostic review is conducted. This involves a diagnostic team - someone from the state DOT, the road authority, and the railroad meeting at the crossing to determine the appropriate device to be installed. If federal funds were used for signals at Huntington and/or Windsor Streets, the diagnostic team(s) should have considered Montpelier for a corridor project and looked at all crossings in the area as either closure candidates or to be upgraded with gates. Apart from the diagnostic team, NS could have done a review on its own and then worked with the state and local community to implement a corridor project.

There is a house very close to the tracks in the northeast quadrant of High St. that limits the sight distance to the north. That hazardous condition should have been noted by NS' passing trains crews, 28 a day at the time of the collision, by the maintenance of way department who patrols that line twice a week (who also participates as a member of the Division Grade Crossing Safety/Trespass Committee), or by any group hy-railing that line segment for any other purpose. If the obvious sight obstruction had been observed and reported, NS would have discussed how to improve the condition and taken appropriate action. Instead, either no one observed the condition or, if they did, NS failed to take any action in violation of its corporate policy and procedures.

7

In July 1994 the U.S. DOT/FRA published a document titled Highway-Railroad Grade Crossings – A Guide to Crossing Consolidation and Closure. The document encourages the closure of unnecessary highway-rail grade crossings. High St. should have been considered for closure given that parallel streets Windsor and Huntington were one block away on either side and Grant and Jefferson Streets easily connect to those streets. NS' track chart shows five crossings in 6/10 mile between Windsor St., mp 149.05, and Monroe St., mp 148.73. The FRA recommends no more than four crossings in a mile which is another reason to consider closing High St.

A letter in the file dated March 3, 1993, from NS' Resident Vice President Cliff DeLaCroix to then Mayor Neff of Montpelier, recaps the details of a meeting DeLaCroix had with the mayor, clerk/treasurer, and city council members wherein NS offered the city an incentive payment of $30,000.00 to close High and Green Streets. If the city also agreed to close Monroe St., the payment increased to $45,000.00. Montpelier offered to close High and Green Streets if NS could bring an industrial development project to Montpelier. The city also asked NS to support the construction of a grade separation at Huntington St. and cover the city's share of the local matching money. DeLaCroix referred the city's request for an industrial development project to NS' Industrial Development Department and advised the city the railroad would cover the cost of their cost of matching funds if High and Green Streets were closed. He suggested the city complete the appropriate forms and submit them to INDOT for the grade separation. Unfortunately there is no other correspondence regarding the proposal which indicates there was no follow-up. If any follow-up had occurred the proposals would have moved forward or been unsuccessful. If the city of Montpelier would not agree to any closures, NS could have contacted INDOT and requested a hearing to force the closure of those streets.

NS failed to comply with its own 400 policy and procedures to identify hazardous crossings and take the necessary steps to mitigate those hazards. Failure to do so endangers the motoring public. This failure enabled the hazard to exist which allowed the 9/3/11 collision to occur.

**TRAIN CREW:**

In his deposition, NS Engineer Mickey Coak stated he first saw Brown's vehicle when it was on the east side of the building that was close to the tracks. He noticed the car because it was moving at a slow rate of speed, 2,3,4 mph and he thought it was going to stop. This speed conflicts with the report from Crash Data Retrieval which shows the vehicle was travelling 31 mph 5 seconds before the crash and the speed was reduced to 20 mph 1 second before the crash.

Coak took no action at the time he first observed the vehicle other than to continue blowing the horn. He was seated on the opposite side of the locomotive and had a

limited view of the direction from which the vehicle approached the crossing. He saw the vehicle for the second time when it passed the building but only for a very short time, 3-4 seconds, before the crash. Croak stated he stood up because it was apparent he was going to hit the vehicle and applied the emergency brake almost simultaneously with the crash. At the time Coak stood up he stated he removed his hand from the horn lever. He testified he did not see the flashers until he stood up and did not hear the bell at the crossing because the locomotive horn was blowing. In his deposition it was not clear if the flashers were working when Coak saw them or he simply observed their presence out the window. Coak said the horn was blown continuously from the time he first observed the vehicle on the east side of the building until he stood up just before the crash. Coak testified he had received no locomotive simulator training that covered similar emergency situations.

At the time of the crash the train's speed was 53 mph, below the timetable speed of 60 mph.

Coak stated there was no conversation between him and conductor Christopher Barnes regarding the vehicle. Barnes was seated on the same side of the locomotive the vehicle approached from but did not see it because he was looking down reading slow orders. This is contrary to his responsibility to be vigilant - observe and keep a lookout. In spite of this knowledge, Coak states in his deposition he thought Barnes was keeping a proper lookout.

Barnes confirmed he was looking at slow orders and did not see the vehicle but also states he was keeping a proper lookout ahead. He behaved in this manner even though he acknowledged the engineer's view was restricted by the front end of the locomotive. Barnes had been through Montpelier many times in the past and knew, or should have known, there were five grade crossings very close together and the safe course would have been to focus his undivided attention on those crossings. Barnes stated he knew there was a point in time where there were no crossings and then it would have been more appropriate to review the slow orders. Barnes is required to remind the engineer of those orders two miles in advance of when they apply (Operating Rule 91 (a)). Montpelier is five miles from the slow order location.

After the crash Barnes walked backed to the crossing but did not observe if the crossing signals were working properly. He is required to obtain information regarding any witnesses (Operating Rule O.2.) and at that point becomes a witness himself.

When asked about sight obstructions t the crossings, Barnes said in his opinion he didn't see anything "that would obstruct to see a train coming". He acknowledges he knew the building was there and that it could "to a point" obstruct the vision of anyone operating a train for vehicles approaching the tracks. In his opinion "there's still plenty of room for motorists to visually see in that direction of a train coming". Barnes testified

he had no knowledge of any instructions regarding the reporting of crossings having visual obstructions.

Conductor Barnes is an example of NS' failure to properly train its employees regarding what constitutes a hazard at grade crossings. Further, NS' failed to train and/or supervise its employees regarding compliance with the Operating Rules as those rules apply to reporting unsafe conditions at grade crossings and maintaining a vigilant lookout - Operating Rules F, J, O(2), GR-27, 80, 91(a), 98, 582, and 817. The railroad also failed to train its employees to recognize what constitutes hazardous conditions; in this case a sight obstruction.

## HORN:

The use of train horn is governed by the FRA under CFR 49-222.21. The horn is required to be blown for no less than 15 seconds nor more than 20 seconds when the train is approaching highway-rail grade crossings. Trains travelling at or more than 60 mph are required to start sounding their horn ¼ mile before arriving at the crossing.

Looking at the rail-view video, Engineer Coak did not sound the train horn consistently at the six crossings shown in the video. At Windsor St., the crossing just before High St., he sounded the horn for two seconds, then three seconds, then two blasts for ½ second each. However, there was a glitch in the video at Windsor St. which may have affected the viewer's ability to accurately determine what actually took place. After Windsor the horn was sounded for three seconds, a pause, then again for four seconds just prior to the crash. The horn was not being sounded as the train crossed High St. This may be explained in Coak's deposition when he stated he stood up just prior to the crash and may have stopped sounding the horn. This rule states the horn must be sounded in a pattern of two long blasts, a short blast, and a long blast that must be sounded until the locomotive occupies the crossing.

An off duty police officer Mike Wilson, Hartford City Police Department, was about a block behind the Brown vehicle and witnessed the crash. Wilson stated he heard the train's horn once before the accident and again immediately before the crash.

Neither Rodney Brown nor Angela Brown heard the horn.

Train horns studies dating from 1967 indicate the horn is not a satisfactory primary warning device. These studies cover the type of horns installed on locomotives, where the horns are mounted, the horn's decibel level, the insertion level in the vehicle, and noise inside the vehicle – heater/air conditioner on, radio playing, conversation, road noise, etc. If the horn is not heard by the driver of the vehicle and recognized as a warning, it is not effective.

Given the various ways the train horn was sounded in the video, NS failed to properly train and supervise its employees as to how to properly sound the horn when approaching public grade crossings. The engineer's failure to properly sound the horn in this case led to an insufficient warning to the oncoming driver which contributed to the cause of the 9/3/11 collision.

## DRIVER BEHAVIOR:

Neither Rodney nor Angela Brown testified to seeing or hearing the approaching train. Numerous studies have been done regarding driver behavior at grade crossings and would provide an explanation as to why this happened i.e. driver inattention, distractions inside the vehicle – adjusting controls, radio/cd, conversation with passengers, cognitive activities (daydreaming), cell phone usage, or simply the multi-task requirements of driving – maintaining a safe peed, checking mirrors, looking at the roadway conditions, looking for oncoming traffic, staying in the proper lane, etc.

Drivers are rational but imperfect decision makers. Decisions are not made solely on the information at the crossing but include the driver's perceptions and experiences. This includes any experience with the crossing and the likelihood of an approaching train. Age is also a factor. Brown was 29 years old at the time of the accident. His wife, a family friend, and her infant child were in the vehicle. These facts do not put Brown in the category as a risk taker.

In the rail view video there was a vehicle approaching the crossing from the opposite direction. It's logical to conclude Brown's attention was diverted to that vehicle in order to determine whether both vehicles would arrive at the crossing at the same time and whether the crossing was wide enough to accommodate both vehicles passing over the tracks at the same time.

Sight distance was limited because of the building in the northeast quadrant. The building was 42 feet from the tracks and prevented any driver from seeing an approaching train until past the building. Studies show drivers need at least 2½ seconds perception/reaction time to make a decision as to whether to proceed or stop. Based on the Crash Data Retrieval report the vehicle was travelling at 23 mph two seconds before the crash. At this speed, given the train speed of 53 mph, a motorist would need approximately 520 feet of sight distance 135 feet from the tracks. At this location, two seconds from the track, there was 121 feet of sight distance. Nowhere near the distance recommended by the sight distance chart.

Limited sight along the track when approaching the crossing hinders the driver's ability to detect an oncoming train. Drivers must be able to see and/or hear an approaching train in sufficient time to make the decision whether to stop or proceed safely across the tracks. Various studies highlight the importance of adequate sight distance and the

11

need to take corrective measures if the sight distance is not sufficient. Norfolk Southern knows this to be true based on their experience with grade crossing collisions and from the availability of the studies. The fact gated crossings are safer than flashing lights only crossings is also known to the railroad. Yet given the limited sight distance NS failed to take any action to install gates at High St.

## CONCLUSIONS:

Norfolk Southern does not apply the same principles of work place safety to public safety. The railroad knows the importance of conducting a thorough investigation and root cause analysis of accidents. The information developed from a properly conducted investigation can be used to take corrective action and prevent future accidents. Norfolk Southern fails to conduct a root cause analysis of grade crossing collisions; choosing instead to blame the diver. This adversarial position prevents the railroad from directing resources at the root cause of collisions. NS knows how to prevent grade crossing collisions. It simply ignores what it knows and continues to endanger the motoring public. In my opinion, in this case NS failed to conduct a root cause analysis because it would have pointed the finger back at their failure to either close or upgrade the safety at this extra-hazardous crossing.

Norfolk Southern failed to conduct any public education Operation Lifesaver program or Grade Crossing Collision Investigation Course in Montpelier or Blackford County.

Norfolk Southern knows the importance of keeping accurate records and documenting accidents. Even so, it failed to timely report the change in signal conditions and the train speed increase at High St. to the FRA.

Norfolk Southern failed to learn from previous grade crossing collisions. The railroad should have looked at High St. and noted the limited sight distance, its close proximity to crossings on either side, and the total number of crossings in 6/10 of a mile. The railroad should have proposed a corridor project in Montpelier which would have identified High St. as a closure candidate or a location to be upgraded to gates. This definitely should have been done when the signals at either Windsor St. or Huntington St. were upgraded but could have been done at any time. Instead Norfolk Southern ignored its own 400 policies regarding crossing improvements and/or closure. This tragedy could have been prevented if NS had followed its own policies and procedures.

Norfolk Southern failed to monitor how train crews sound the horn approaching grade crossings. The horn should be sounded consistently and in accordance with the FRA rule. NS' lack of training and supervision led to the horn not being sounded correctly prior to this collision which contributed to cause this tragedy.

In 1993 Norfolk Southern proposed the High St. crossing be closed but never followed through. Once again NS failed to follow its 400 policies and procedures.

Norfolk Southern failed to properly train its employees to identify hazardous conditions at highway-rail grade crossings. There is no indication any train crew or track inspector reported the limited sight distance at High St. In fact Conductor Barnes stated he didn't see anything that would "obstruct to see a train coming".

Norfolk Southern should have utilized its knowledge of driver behavior and its experience from previous grade crossing collisions to proactively make this highway rail grade crossing safer. Its failure to use that knowledge, failure to properly train and supervise it employees, and failure follow its own rules directly resulted in this horrific tragedy that caused the loss of Thomas Janero's pregnant wife and infant son. High St. should have been closed or upgraded years before this collision.

Respectfully submitted,

William R. Hughes
Hughes Consulting



# HUGHES CONSULTING

September 11, 2015

Mr. Jeff Wrage
Blachly, Tabor, Bozik, & Hartman
56 S. Washington St., Suite 401
Valparaiso, Indiana 46383

Dear Mr. Wrage:

I reviewed the depositions you sent of Jeffrey Chwalek, Norfolk Southern Police Department, Derick Mason, and Bill Barringer.

In his deposition Mr. Chwalek denies ever conducting any investigation of a highway-rail grade crossing collision. Instead that responsibility fails to the local law enforcement agency with jurisdiction at the location. If close enough to the accident Chwalek will go to the crash site and assist and act "as a liaison" but at no time has he ever made any determination of the root cause of the crash in conjunction with the local police. Even if he does not do any reporting, Chwalek, with his railroad experience, could at least assist in determining the root cause of the accident. Instead he remains "silent" on the cause. This is indicative of Norfolk Southern's willingness to always blame the motorist.

Chwalek also denies any training or experience regarding the sight distance triangle yet admits to attending the railroad's Grade Crossing Collision Investigation course. Sight distance is covered in that course.

Crossing closures were part of Chwalek's job when he was in the Grade Crossing Safety Department so he understood the criteria and the procedure to follow for getting a crossing closed. He also knew that a project for a closure could be accompanied with the signalization of an adjacent crossing which would have an increase in traffic. Chwalek knew about corridor projects but never had the time to develop any.

Operation Lifesaver trains were part of Chwalek's responsibility and he acknowledges riding on the trains. He states the purpose of the train would be for a local police officer with jurisdiction in that area to ride the train and when a motorist was seen violating a law as it pertained to the grade crossing, the officer would radio a unit following the train and the motorist would be cited. Yet another example of blaming the motorist. No mention was made of attempting to find out from the motorist why he committed the violation.

After viewing pictures of the subject crash, Chwalek states he would have to be past the building to see down the track. He also mentions having to look far to the right takes his eyes off the roadway and prevents looking for oncoming traffic.


EXHIBIT
C

Chwalek dances all around the question of gates/light/bells being the most effective warning device quoting the oft used statement that over 50% of the grade crossing crashes occur at crossing with active warning devices. No one making that statement offers any explanation as to why that happens and when pressed, while never say the installation of active warning devices should be discontinued.

Derrick Mason was a member of the Grade Crossing Safety Group for eight years and held a similar position as Jeff Chwalek. In his deposition Mason pretty much echoes Chwalek's version of the duties of Manager of Grade Crossing Safety. Neither one seems to believe they had any ability to affect what type of signalization is placed at grade crossings. In fact, they could have made any recommendation they deemed appropriate and followed thru with Norfolk Southern's C&S Department to the point of assisting with funding. Mason states he never dealt with the grade crossing budget which is interesting because he had the authority to offer incentive money for closures as well as signal improvements.

Mason, like Chwalek, refuses to acknowledge that gates, lights, bells, are the best warning devices at grade crossings even though it's been acknowledged by a variety of sources that's the case.

Mason also states he has no knowledge regarding sight distance and never once stopped on a hy-rail trip to inspect sight issues at a grade crossing. Neither did he ever conduct any type of investigation to determine the cause of a grade crossing collision. He would get notification a crash occurred on his territory but would only monitor the frequencies of such crashes, not causation. Further, Mason did not involve himself with the geometric design at crossings leaving that up to the road authorities. The fact he didn't get involved means he didn't know any better – improperly trained – or simply was too busy left it up to others.

Bill Barringer was the last deposition read. He correctly states that the vast bulk of his grade crossing experience prior to coming to Norfolk Southern was supervising two people who focused only on public education.

Barringer fails to acknowledge any training regarding the limitation on train horn audibility. Almost every seminar we attended had a presentation on train horns. Operation Lifesaver even acknowledged that vehicles have better sound proofing making it more difficult to hear train horns and encourages people approaching grade crossings to turn down their radios and heaters/air conditioners and roll down their windows. This almost the opposite of what Barringer says – quieter cars make it easier to hear train horns. Further, there were numerous publications that came to Norfolk Southern dealing with train horns.


Barringer's comments about sight distance are confusing. He says he has never performed sight distance calculations and that we're (meaning Norfolk Southern) not involved in them. Yet he goes on to say there are three different types of sight distance and can name all three. He states cornering sight distance is used by traffic engineers use sight distance when they

want to control traffic over a crossing. He goes on to say that deals with a non-controlled intersection and a grade crossing is a controlled intersection. In the same paragraph he says it doesn't make sense in the world of old grade crossings. It does make sense in a new grade crossing in a new world where there wasn't trees and buildings and mountains. This seems contradictory and implies he is aware these types of obstructions are a factor for motorists. Bill acknowledges he gained his knowledge from, among other sources, the Highway Grade Crossing Handbook, the same handbook that contains the sight distance triangle. Apparently he can pick and choose what information he deems valid.

One of the things Barringer uses in assessing crossings is "where the motorist would normally stop to be able to yield to a train". At passive crossings the motorist is not required to stop unless he sees or hears an approaching train. Even at flashing light only crossings the motorists must stop but can then proceed if a train is not in hazardous proximity to the crossing. Barringer states highway traffic engineers use the sight distance triangle but fails to recognize the highway-rail grade crossing is also an intersection. He denies anyone in the rail industry uses the sight distance triangle in the Grade Crossing Handbook. But as previously stated, he goes on to define clearing sight distance which uses numbers from the Grade Crossing Handbook. He also says sight distance is not used at diagnostic reviews yet it is clearly listed as one of the items to consider on the checklist found in the Grade Crossing Handbook.

Like Chwalek and Mason, Barringer fails to acknowledge gates, lights, bells provided for better warnings. This even though the federal government spends over $200M annually to install gates at grade crossings.

Barringer incorrectly answered the question regarding the fact I developed Norfolk Southern's first Grade Crossing Collision Investigation Course. He talks about it being an industry work product and mentions the name Pat Samples. To be clear, I did in fact develop Norfolk Southern's course patterned after the course developed by Glenn Hunsucker of the then Aitcheson, Topeka, & Santa Fe and Pat Samples of then BNSF. I used many of their materials, with permission, and have acknowledged the same many times in depositions. I also trained other NS police to be instructors.

As part of the course I used, as a handout, the sight distance triangle. This came to me in a newsletter from Hoy Richards, a consultant who worked with the Texas Transportation Institute. He published the triangle in a newsletter ad it made sense to me that motorists needed to see a train approaching the crossing in sufficient time to make a go-no go decision. I believed that police officers attending the class needed to know that information in order to make an accurate report. If the report stated sight distance was a factor, then the railroad could work with the necessary parties to mitigate the problem. The course was ultimately put into a loose leaf notebook and the sight distance triangle was included as a tab in the book. Sometime after that I received a call from Roger Petersen, NS Claims Department, wanting to know about the triangle. I explained to him what was previously stated and was instructed to remove the triangle from the book because NS was being sued regarding sight distance. Because it appeared in the manual, plaintiff's attorneys were saying NS had adopted the

triangle. That was never the case and was never taught otherwise. Regardless, the diagram and chart were removed. Operation Lifesaver subsequently took over the course management to provide consistency. Sight distance is mentioned in the latest version of the course. Interestingly, the course Barringer took at the University of Wisconsin is a version of the Grade Crossing Collision Investigation Course now being taught.

The railroad industry understands the importance of sight distance and has developed a vegetation plan accordingly. The clearing distances are varied by state and generally do not conform to the sight distance triangle. However, it's generally understood if there is insufficient sight distance and no correction can be made, the crossing should be considered a candidate for closure or placement of active warning devices.

Sincerely,

William R. Hughes
Hughes Consulting