# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

THOMAS A. JANERO, individually and as )
Personal Representative of the Estate of )
Kristen M. Janero and the Estate of )
Xander D. Janero, )
)
      Plaintiffs, )
)
      v. )     CAUSE NO.: 1:13-CV-155-TLS
)
NORFOLK SOUTHERN RAILWAY )
COMPANY, )
)
      Defendant. )

## OPINION AND ORDER

This matter comes before the Court on Defendant Norfolk Southern Railway Company's

Motion for Partial Summary Judgment [ECF No. 73] and Plaintiff Thomas A. Janero's Motion

for Partial Summary Judgment [ECF No. 76]. The Plaintiff, individually and as a personal

representative of the Estate of Kristen M. Janero and the Estate of Xander D. Janero, filed a

Complaint [ECF No. 1] against the Defendant for wrongful death. This matter is fully briefed

and ripe for the Court's review.

## BACKGROUND

On September 3, 2011, an accident occurred in Montpelier, Indiana, at the intersection of

High Street and the railroad track owned and operated by the Defendant. The High Street

crossing and its surroundings are laid out like this:



(Brach Decl. Ex. 2, ECF No. 80-5.)

The following facts are not in dispute. On the morning of September 3, 2011, a train that was owned and operated by the Defendant headed south toward High Street. There were two locomotive cars and 35 loaded railcars, and the Defendant's train was approximately 5,768 tons and 6,615 feet long. Engineer Mickey Coak was seated on the right side of the train and Conductor Christopher Barnes was also in the locomotive. The train's speed was a constant 53 miles per hour as it approached the High Street crossing.

Rodney Brown, who was driving a Pontiac Grand-Prix, headed west on High Street toward the railroad crossing. His wife, Angela Brown, was in the passenger seat. In the backseat

2

were Ms. Janero and her son Xander, the decedents in this case. Mr. Brown approached the High Street crossing at roughly 5.5 miles per hour.

As Mr. Brown approached the High Street crossing, the intersection's northeast quadrant was on his right. There was a set number of warning devices at the High Street crossing: flashing lights, a mast with crossbucks and a bell, and an advanced railroad warning sign. To his right was a shed-structure, which blocked his line of sight further north on the railroad track. There was a signal box at the intersection's corner, between the tracks and the shed-structure in the northeast quadrant. And further north up the track to Mr. Brown's right was a tree.

Roughly 13 seconds before reaching the crossing, the Defendant's train started to sound its horn. The horn sounded five times total before the accident occurred. Engineer Coak first observed Mr. Brown's car when it was east and to the left (from his vantage point) of the shed-structure, approximately 6-7 seconds before the accident. The shed-structure obstructed any view of Mr. Brown's car for a few seconds, but then Engineer Coak observed him once more west and to the right of the shed-structure, approximately 3–4 seconds before the accident occurred.

Then, at approximately 11:20 a.m., Mr. Brown's car and the Defendant's train collided at the High Street crossing. Engineer Coak applied the train's emergency brake, but Ms. Janero and her son were thrown from the car upon impact and died from the injuries that they sustained in the collision.

## PROCEDURAL BACKGROUND

The Plaintiff was Ms. Janero's husband and Xander's father. On April 29, 2013, he instituted this negligence action in Blackford County Superior Court against the Defendant and CSX Transportation, Inc., for wrongful death. He claimed that the Defendant "was negligent in operating its passenger train at a speed too fast for conditions," in "failing to sound its horn

warning motor vehicle traffic . . . that it was approaching the crossing," "failing to operate its passenger train in a reasonably safe manner," and "failing to keep a proper lookout for vehicles approaching and crossing the tracks." (Compl. ¶ 10, ECF No. 1.) As to CSX Transportation, the Plaintiff claimed that it "owned and had a duty to maintain the railroad right of way on High Street," but that it failed "to maintain the railroad right of way" and "to maintain good visibility" at the crossing. (*Id.* ¶ 11.) A Notice of Removal [ECF No. 2] was filed on May 10, 2013, pursuant to 28 U.S.C. § 1441. On June 10, 2013, the Plaintiff and the Defendant jointly stipulated to dismiss CSX Transportation from the lawsuit, leaving only the present parties. [ECF No. 15.]

After the close of discovery, both parties filed for partial summary judgment. On October 28, 2015, the Defendant filed a Motion for Partial Summary Judgment accompanied by a Supporting Brief [ECF No. 80]. The Plaintiff responded to the Defendant's Motion on April 11, 2016 [ECF No. 91], and included a Brief [ECF No. 92] and Supplemental Brief [ECF No. 93]. The Defendant's Reply [ECF No. 101] was entered on May 11, 2016. Also on October 28, 2015, the Plaintiff filed his Motion for Partial Summary Judgment with an accompanying Supporting Brief [ECF No. 77]. The Defendant's Response [ECF No. 87] was filed on April 11, 2016. And on May 11, 2016, the Plaintiff's Reply [ECF No. 98] was filed.

Separately, the parties moved to strike parts of their opposing parties' Summary Judgment Motions. On April 11, 2016, the Defendant filed a Motion to Strike [ECF No. 88], seeking to exclude portions of the testimony of the Plaintiff's expert audiologist. On April 27, 2016, the Plaintiff filed his Response [94], and the Defendant's Reply [ECF No. 95] was entered on May 2, 2016. Then, on May 11, 2016, the Plaintiff filed a Rule 12(f) Motion to Strike [ECF No. 97], asking the Court to strike statements from the Defendant's Response to the Plaintiff's

Motion for Partial Summary Judgment that implicated Federal Rule of Evidence 609. The

Defendant responded on May 19, 2016 [ECF No. 103], and the Plaintiff replied on May 31, 2016

[ECF No. 104]. Finally, the Defendant filed a Motion to Strike [ECF No. 102] arguments first

raised in the Plaintiff's Reply in Support of his Motion for Partial Summary Judgment, or

alternatively for leave to file a surreply. The Plaintiff filed a Response [ECF No. 105] on May

31, 2016. The time for the Defendant to file a Reply has elapsed. On February 14, 2017, the

Court termed these Motions to Strike because it determined that it would consider them in

conjunction with the parties' Motions for Partial Summary Judgment.

## STANDARD OF REVIEW

Summary judgment is warranted when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). Summary judgment is the moment in litigation where the nonmoving party is

required to marshal and present the court with evidence on which a reasonable jury could rely to

find in that party's favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

A court should only deny a motion for summary judgment when the nonmoving party presents

admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*,

652 F.3d 726, 731 (7th Cir. 2011) (first citing *United States v. 5443 Suffield Terrace*, 607 F.3d

504, 510 (7th Cir. 2010); then citing *Swearnigen-El v. Cook Cty. Sheriff's Dep't*, 602 F.3d 852,

859 (7th Cir. 2010)). A court's role in deciding a motion for summary judgment "is not to sift

through the evidence, pondering the nuances and inconsistencies, and decide whom to believe.

[A] court has one task and one task only: to decide, based on the evidence of record, whether

there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24

F.3d 918, 920 (7th Cir. 1994). Material facts are those that are outcome determinative under the

applicable law. *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

## JURISDICTION

This Court has diversity jurisdiction over this suit. 28 U.S.C. § 1332. The parties are completely diverse. For purposes of diversity jurisdiction, the Plaintiff is a citizen of Indiana and the Defendant is a corporation incorporated in Virginia, as well as with its principal place of business in Virginia. The injuries suffered in this case exceed the amount in controversy threshold of $75,000. The matter was properly removed from state court pursuant to 28 U.S.C. §§ 1441 & 1446.

## ANALYSIS

To hold a defendant liable for negligence, a plaintiff must prove "(1) the defendant has a duty to conform its conduct to a standard of care arising from its relationship with the plaintiff, (2) the defendant failed to conform its conduct to that standard of care, and (3) an injury to the plaintiff was proximately caused by the breach." *Indianapolis-Marion Cty. Pub. Library v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 726 (Ind. 2010). "Summary judgment is rarely appropriate in negligence cases because they are particularly fact sensitive and are governed by a standard of the objective reasonable person, which is best applied by a jury after hearing all the evidence." *Winfrey v. NLMP, Inc.*, 963 N.E.2d 609, 612 (Ind. Ct. App. 2012). "Nevertheless,

summary judgment may be granted to a defendant if the undisputed material evidence negates one element of a negligence claim." *Nagel v. N. Ind. Pub. Serv. Co.*, 26 N.E.3d 30, 43 (Ind. Ct. App. 2015).

For ease of organization, the Court will assess each theory of negligence individually, but will also consider whether these theories, as a whole, sufficiently state a claim for negligence. *See J.B. Hunt Transp., Inc. v. Guardianship of Zak*, 58 N.E.3d 956, 972 (Ind. Ct. App. 2016) (citing *Hellums v. Raber,* 853 N.E.2d 143, 146 (Ind. Ct. App. 2006) ("It is well established that an injury may have more than one proximate cause."). Finally, the Court does not include a formal analysis of the parties' various Motions to Strike, as they are unnecessary for the Court to render its ruling.

## A.      The Defendant's Motion for Partial Summary Judgment

The Defendant moves for summary judgment on the following grounds. First, that the warning devices at the High Street crossing were installed with federal funds under a federally approved project, and thus federal law preempts any claim that the devices were inadequate or that the Defendant should have closed or petitioned for closure of the High Street crossing. Absent a finding of federal preemption, the Defendant asserts that it did not have a duty under Indiana law to close or petition to close the High Street crossing.

Second, that the Defendant did not have a duty under Indiana law to paint pavement markings, and that the absence of any pavement markings did not cause the accident. Third, that the train was traveling within the federally mandated speed limit, thereby preempting any claim for excessive speeding. Alternatively, that if the train was speeding, it was not a proximate cause

of the accident.[1] Fourth, that the horn was sounded according to federal regulations, which preempts any claim that the Defendant should have sounded the train horn differently or louder. Additionally, that sounding the horn in a different fashion or at an earlier time was not a proximate cause of the accident. Finally, that the High Street crossing did not obstruct Mr. Brown's view down the right-of-way.

**1.      *Inadequate Warning Devices***

a.      *Federal Preemption*

Congress enacted the Federal Railroad Safety Act (FRSA) in 1970 "to promote safety in every area of railroad operations" and to "reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. Under the FRSA, the Secretary of Transportation may "prescribe regulations and issue orders for every area of railroad safety," *id.* § 20103(a), who is directed to "maintain a coordinated effort to develop and carry out solutions to the railroad grade crossing problem," *id.* § 20134(a). The FRSA also contains an express preemption provision, which states:

> Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement.

*Id.* § 20106.

Three years later, Congress enacted the Highway Safety Act of 1973, which, through its Federal Railway-Highway Crossings Program, makes funds available to states for the "cost of construction of projects for the elimination of hazards of railway-highway crossings." 23 U.S.C.

---

[1] The Defendant separately moves for summary judgment on the grounds that even if the train crew applied the emergency brake sooner, the accident could not have been avoided. In his Motion, the Plaintiff asserts that the train's crew was not keeping a proper lookout for any possible hazards. These additional theories are considered within the Court's broader analysis of the Plaintiff's excessive speeding claim.

§ 130(a). In that Program, "[e]ach State shall conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose. At a minimum, such a schedule shall provide signs for all railway-highway crossings." *Id.* § 130(d).

The Secretary has instituted certain regulations related to the Highway Crossings Program. Those relevant here regulate the adequacy of warning devices installed under the Program. *See* 23 C.F.R. § 646.214(b)(3)–(4). "Adequate warning devices . . . on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals" if any of several conditions are present. *Id.* § 646.214(b)(3).[2] However, when "the requirements of § 646.214(b)(3) are not applicable" to a crossing, "the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of" the Federal Highway Administration (FHWA). *Id.* § 646.214(b)(4). The Supreme Court has stated that these two subsections

> establish a standard of adequacy that determines the devices to be installed when federal funds participate in the crossing improvement project. . . . If a crossing presents those conditions listed in (b)(3), the State must install automatic gates and flashing lights; if the (b)(3) factors are absent, (b)(4) dictates that the decision as to what devices to install is subject to FHWA approval. . . . In either case, § 646.214(b)(3) or (4) is applicable and determines the type of warning device that is 'adequate' under federal law.

*Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 354 (2000).

---

[2] These conditions include "[m]ultiple main line railroad tracks," multiple tracks in the vicinity such that one train might "obscure the movement of another train approaching the crossing," high speed trains combined with limited sight distances, a "combination of high speeds and moderately high volumes of highway and railroad traffic," the use of the crossing by "substantial numbers of schoolbuses or trucks carrying hazardous materials," or when a "diagnostic team recommends them." *Id.* § 646.214(b)(3)(A)–(F).

Once federal funds are expended to install warning devices at a crossing and those devices are installed and operating, these regulations apply and "state tort law is preempted." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 670 (1993). A state may use its "own funds or . . . additional funding from the FHWA" to install "more protective devices at such crossings." *Shanklin*, 529 U.S. at 357–58. But questioning the wisdom of a state's choices—"different or additional devices" should have been originally installed, "automatic gates and flashing lights would be appropriate" in light of changed "conditions at the crossing"—does not impact the preemption inquiry. *Id.* Once " federally funded devices at a particular crossing" are installed, a state cannot "hold the railroad responsible for the adequacy of those devices." *Id.*

Federal preemption is an affirmative defense, and therefore the Defendant bears the burden of proof. *See Russian Media Grp., LLC v. Cable Am., Inc.,* 598 F.3d 302, 309 (7th Cir. 2010). The Defendant offers the following evidence in support of preemption: In 1975, the Defendant's predecessor, Norfolk and Western Railway Company, entered into an agreement with the State of Indiana whereby it would install "new reflectorized crossbuck signs" at public crossings throughout the State using federal funds made available through the Highway Safety Act. (Bradley Decl. ¶¶ 3–9, ECF No. 80-3.) The project received initial FHWA approval on December 10, 1975, and $801,684.00 in federal funds were obligated for 90% of the project's estimated costs. (*Id.* ¶¶ 11–13, Ex. 1.) Some of these federal funds were allocated for the High Street crossing. (*Id.* ¶¶ 14–16.) One of the Defendant's employees stated that from the late 1970s into the early 1980s, he helped install the "new standard reflectorized crossbucks" at the High Street Crossing, which were placed on both the east and west sides of the crossing. (Blanton Decl. ¶¶ 3, 5–6, ECF No. 80-4.) "On January 29, 1988, the FHWA issued its Final Acceptance Report regarding [Norfolk and Western's] installation of new crossbucks at all public at-grade

crossings" in Indiana. (Bradley Decl. ¶ 18, Ex. 8.) This evidence is sufficient to show federal preemption applies to the High Street crossing. 23 C.F.R. § 646.214(b)(3)–(4); *Shanklin*, 529 U.S. at 354; *Easterwood*, 507 U.S. at 670.

Nevertheless, the Plaintiff disputes that federal preemption applies to the High Street crossing. First, the Plaintiff proposes that federal preemption only exists when 100% of the funds used in the installation of warning devices were federal funds, or when less than 100% of the funds came from the federal government but there was federal oversight of the project. Furthermore, any later installations or replacements that the Defendant made to the High Street crossing were not approved by the federal government and solely involved the use of the Defendant's own funds.[3] Second, the Plaintiff attacks certain of the Defendant's proffered Declarations as lacking personal knowledge and foundation. Third, the Plaintiff contends that, even if the devices installed utilized federal funds, they were not operating at the time the accident occurred.

The Plaintiff misunderstands the law regarding federal preemption under the FRSA and its implementing regulations. "Once the FHWA has funded the crossing improvement and the warning devices are actually installed and operating," federal preemption applies and displaces state law. *Shanklin*, 529 U.S. at 354. There is no requirement that 100% of the funds allocated to safety devices must be federal funds in order for preemption to attach. *See Cochran v. CSX Transp., Inc.*, 112 F. Supp. 2d 733, 738 (N.D. Ind. 2000) (finding preemption after safety devices "were installed *almost* exclusively with federal funds under a program approved by the FHWA") (emphasis added).

---

[3] In particular, the Plaintiff points to the installation of flashing light signals, crossbucks, a track sign, and a bell, at the High Street crossing in 1988. (*See* App. in Supp. of Pl.'s Resp. to Def.'s Mot. Partial Summ. J. ¶¶ 1–29, ECF No. 92.)

In addition, there is no requirement that the federal government must make an individualized inspection of or accept any safety devices later installed to replace any originals. *Shanklin*, 529 U.S. at 356; *Fifth Third Bank v. CSX Corp.*, 415 F.3d 741, 747 (7th Cir. 2005). Preemption occurs when the FHWA funds a warning device project and "is not . . . turned on and off simply because a later decision is made to upgrade a crossing." *Bock v. St. Louis Sw. Ry. Co.*, 181 F.3d 920, 923 (8th Cir. 1999). Indeed, requiring railroads to stick with the same devices initially installed, and revoking preemption were they to seek to maintain or upgrade those devices without the federal government's approval again, would conflict with the very purpose of the FRSA. *Cochran*, 112 F. Supp. 2d at 738 (whether or not a crossbuck that is similar to, but not the exact same as, the crossbuck originally installed with federal funds is "immaterial to the preemption question"); *see also Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 645–46 (5th Cir. 2005); *Armijo v. Atchison, Topeka & Santa Fe Ry. Co.*, 87 F.3d 1188, 1192 (10th Cir. 1996).

Those cases upon which the Plaintiff relies do not persuade this Court that a railroad's use of its own funds to maintain and upgrade a crossing revoke federal preemption. *See Ind. R.R. Co. v. Davidson*, 983 N.E.2d 145, 146–47 (Ind. Ct. App. 2012); *Boomsma v. Dakota, Minn. & E. R.R. Co.*, 651 N.W.2d 238, 243–44 (S.D. 2002); *Union Pac. R.R. Co. v. Cezar*, 293 S.W.3d 800, 815–16 (Tex. Ct. App. 2009). In *Davidson*, federal funds "participated in the installment of the original crossbucks," but newer ones were installed with "only state funds" and "not placed in the exact same location at the crossing as their predecessors." 983 N.E.2d at 152. This evidence necessitated a question of fact as to "whether the federal government affirmatively abandoned the project and federal preemption no longer applie[d]." *Id.* Here, the Plaintiff has designated no facts to show that only state funds were used for improvements or that any subsequent installations were not located in exactly the same place. And both *Boomsma* and *Cezar* did not

involve federally funded warning devices, so neither is directly on point here. 651 N.W.2d at 243–44; 293 S.W.3d at 815–16. Despite the Plaintiff submitting lots of evidence that only the Defendant's funds participated in the 1988 High Street crossing upgrade, (*see, e.g.*, Barringer Dep. 187:15–19, ECF No. 93-4; Blaschke Dep. 124:25–125:3, ECF No. 92-5; RFP-5, ECF No. 92-2; Document, ECF No. 92-1), such evidence is "immaterial to the preemption question," *Cochran*, 112 F. Supp. 2d at 738.

The Plaintiff's attacks on the Declarations of Cheri Bradley and Calvin Blanton also fail. According to the Plaintiff, Bradley began working for the Defendant in 1992 and thus did not have personal knowledge of the installation project. *See* Fed R. Civ. P. 56(c)(4) (requiring "personal knowledge," the use of "facts that would be admissible in evidence," and "competen[ce] to testify" for a Court to properly consider a declarant's statements at summary judgment). However, as the Defendant correctly points out, a witness need not have personal knowledge of the entries in records when the business records exception is applicable. *United States v. Wables*, 731 F.2d 440, 449 (7th Cir. 1984) ("The witness need only have knowledge of the procedures under which the records were created."). Bradley states in her Declaration that it was a regular practice of both Norfolk and Western and the Defendant "to make and keep such records in the course of its regularly scheduled business activities." (Bradley Decl. ¶ 20; *see also* Fed. R. Evid. 803(6).) This is sufficient for the Court to properly consider the business records at summary judgment. Similarly, the Plaintiff argues that Blanton lacked personal knowledge of the federal funding for the statewide project and the funding for the upgrades in 1988.[4] "It is true that

---

[4] The Plaintiff points out that "Mr. Blanton also claimed the wigwag signals at the High Street crossing were replaced in 1981 or 1982, when the designated evidence clearly shows the wigwag signals were replaced around November 21, 1988." (Pl.'s Resp. to Def.'s Mot. Partial Summ. J. 12, ECF No. 91.) An inadvertent inconsistency in a declaration does not suddenly mean the declarant "lacks credibility" (*id.*), and Rule 56 does not compel a court to disregard declarations when they have such inconsistencies. *See* Fed. R. Civ. P. 56. The Plaintiff's reliance upon *Piscione v. Ernst & Young, LLP*, 171 F.3d 527 (7th

'personal knowledge' includes inferences . . . . But the inferences and opinions must be grounded in observation or other first-hand personal experience." *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991) (citations omitted). While it is unclear that Blanton had personal knowledge of the project upgrades, the Plaintiff's attack does not raise a genuine issue of material fact for purposes of summary judgment because he has not offered evidence to "contradict the facts averred by [the party] moving for summary judgment." *See Payne*, 337 F.3d at 773. Even without the Blanton Declaration, the remainder of the Defendant's evidence shows that federal funds participated in the statewide safety device project and its subsequent upgrades.

Finally, the Plaintiff argues that, whether or not federal funds participated in the installation of warning devices at the High Street crossing, none of those devices were properly operating at the time of the accident. (*See* Pl.'s Resp. 11 n.4.) However, the Plaintiff's cited authority does not support such a requirement. *See Thiele v. Norfolk & W. Ry. Co.*, 68 F.3d 179, 181, 183 (7th Cir. 1995). In *Thiele*, a motorist and a train collided at a crossing that had received federal funding for warning devices but, at the time of the accident, those devices were not yet physically installed and operational. *Id.* That court stated that preemption of state law did not occur "until the warning devices [we]re installed and fully operational." *Id. Thiele*'s phrase "fully operational" is temporal, as it refers to the fact that preemption is only triggered after warning devices are *actually installed. Id.*; *see also Shanklin*, 529 U.S. at 354 (holding that federal preemption applies "[o]nce the FHWA has funded the crossing improvement and the warning devices are *actually installed* and operating") (emphasis added). The phrase "fully operational" does not mean preemption disappears if warning devices fail to function properly on

---

Cir. 1999), is inapposite. *See id.* at 533 (quoting *Miller v. A.H. Robins Co.*, 766 F.2d 1102, 1104 (7th Cir. 1985) ("Parties cannot thwart the purpose of Rule 56 by creating issues of fact through affidavits that contradict their own depositions.")).

a given occasion. *See Michael v. Norfolk S. Ry. Co.*, 74 F.3d 271, 273 (11th Cir. 1996) (noting

that 23 CFR § 646.214(b)(3)–(4) "deal with the design and installation of new warning devices,

not the maintenance of those devices or the failure to warn the public of defective devices").[5]

Rather, it is ongoing once the initial requirements for warning devices are met.

Because the Defendant has offered sufficient evidence that "the FHWA has funded the

crossing improvement and the warning devices [we]re actually installed and operating,"

*Shanklin*, 529 U.S. at 354, federal law preempts the Plaintiff's state law negligence claim

premised upon the inadequacy of the warning devices. 23 C.F.R. § 646.214(b)(3)–(4).

b.      *Extra-Hazardous Crossing, Failure to Petition for Closure of the Crossing*

As an alternative theory of liability, the Plaintiff argues that the High Street crossing was

"extra-hazardous, due to its skewed angle crossing and other factors." (Pl.'s Resp. 21–24.)[6]

Under Indiana law, a railroad operator must install crossbucks "at each grade crossing of its

railroad with any public highway." Ind. Code. § 8-6-6-1. Additional duties exist for railways

beyond section 8-6-6-1 when a crossing is "extra-hazardous." *Johnson v. Consolidated Rail

Corp.*, 797 F.2d 1440, 1444–45 (7th Cir. 1986). A grade crossing is a hazardous, "known place

of danger," *Bailey v. Martz*, 488 N.E.2d 716, 721 (Ind. Ct. App. 1986), but it is a question of fact

---

[5] In his Motion for Partial Summary Judgment, the Plaintiff argues that these warning devices failed to comply with 49 C.F.R. §§ 234.217, 234.225. (Mem. in Supp. of Pl.'s Mot. Partial Summ. J. 3–5, ECF No. 77.) Because that claim is unrelated to the question of federal preemption under 23 C.F.R. § 646.214(b)(3)–(4), the Court considers it later on in its Order.

[6] These included a "restricted sight distance for motorists," the "nature and gradation along with the angle at which the railroad track intersected with High Street," lack of pavement markings, and "an insufficient clear line of sight . . . for a westbound driver." (Pl.'s Resp. 15–18.) In addition, the Plaintiff offered three expert witnesses, who opined that the combination of factors "rendered this crossing extra-hazardous." (Pl.'s Resp. 16; Hughes Aff. Exs. B–C, ECF No. 92-8; Francis Aff. Exs. B–C, ECF No. 92-6; Loumiet Aff. Ex. B, ECF No. 78-15.)

whether a crossing is extra-hazardous, *Cent. Ind. Ry. v. Anderson Banking Co.*, 247 N.E.2d 208, 211 (1969).

The Defendant points out that when a crossing receives federally funded warning devices under a project approved by the FHWA, federal law preempts any claim that the crossing is "extra-hazardous." *Randall v. Norfolk S. Ry. Co.*, 800 N.E.2d 951, 956 (Ind. Ct. App. 2003). This is a correct statement of the law. Norfolk received federal funding for warning devices and used those funds to install warning devices at the High Street crossing, as discussed above. Again, federal law preempts any consideration of the Plaintiff's arguments that the High Street crossing was "extra-hazardous" and that the crossing should have been closed. *See id.* (holding that the plaintiff's "attempt to avoid preemption by casting his negligence claims in terms of duties to petition [wa]s not effective, as such claims ultimately amount[ed] to an effort to hold the Railroad responsible for the adequacy of the warning devices).

Likewise, the Plaintiff claims that the Defendant should have closed or petitioned for closure of the High Street crossing. *See* Ind. Code §§ 8-6-7.7-3 to -3.3. Under Indiana law, a grade crossing may be "legally closed and abolished as a public way" either "(1) upon a finding that the enhancement of public safety resulting from the closing will outweigh any inconvenience caused . . . ; or (2) based upon criteria specified in rules adopted by the [Indiana Department of Transportation (INDOT)]." *Id.* § 8-6-7.7-3. The authority to legally close and abolish grade crossings is vested in INDOT and the "governmental unit maintaining the highway." *Id.* Additionally, any person "may petition" the governmental entity "under whose jurisdiction a public railroad crossing lies for [that crossing's] closure." *Id.* § 8-6-7.7-3.2

Even assuming that federal law did not preempt the claim that the Defendant should have either closed or petitioned for the closure of the High Street crossing, the Plaintiff's claim

nonetheless fails for want of a duty. Indiana law imposes a duty on a railroad to take additional

remedial and precautionary measures when a grade crossing is "so peculiarly dangerous,"

*Johnson*, 797 F.2d at 1444–45; *Smith v. Chesapeake & Ohio Ry. Co.*, 778 F.2d 384, 386 (7th Cir.

1985); *Stevens v. Norfolk & W. Ry. Co.*, 357 N.E.2d 1, 4 (Ind. Ct. App. 1976), but no affirmative

duty on a railroad to close or petition to close that crossing. To argue that *Easterwood* and *Smith*

create such an affirmative duty, as the Plaintiff suggests, is to misread them and subsequent

precedent. *See* 507 U.S. at 665 n.5 (noting that Georgia law imposes a continuing duty on

railroads "to take all reasonable precautions to maintain grade crossing safety"); 778 F.2d at 386

("[A] railroad has a duty to protect the public from extra-hazardous railroad crossings and is

required to provide adequate warning to highway travelers of approaching trains.").

Accordingly, the Defendant is entitled to judgment as a matter of law on the Plaintiff's

theory of liability premised on the inadequacy of the warning devices.

## 2.    *Pavement Markings*

No pavement markings existed on High Street at the time of the accident. (*See*

Photographs, ECF No. 93-2.) The parties dispute whether or not the Defendant had a duty to

paint pavement markings at the High Street crossing. Under Indiana law, a railroad's duty with

regard to the road surface at a grade crossing is limited to constructing and maintaining "the

space between the rails, the space between the tracks if there is more than one (1) track, and the

space to the end of its ties in width on the outside of said rails." Ind. Code § 8-6-12-2; *accord id.*

§ 8-23-5-2(h) ("[R]ailroad is responsible for the repair and maintenance of the grade and surface

occupied by the railroad tracks, including the space: (1) between the rails of a railroad track; . . .

and (3) that extends eighteen (18) inches in width on the outside of each rail of a railroad

track."). Beyond the end of the railroad's crossties, it is the responsibility of the governmental unit with jurisdiction over the intersecting highway to construct and maintain that surface. *See id.*

The Defendant argues that the above-discussed Indiana Code provisions only impose a duty on Montpelier (the governmental unit with jurisdiction over High Street) to paint pavement markings. The Plaintiff argues that the Defendant had both a statutory duty and a duty under the Manual on Uniform Traffic Control Devices (MUTCD) to paint markings in advance of a crossing deemed "extra-hazardous." *See* 23 C.F.R. § 214(b)(1) ("All traffic control devices proposed shall comply with the latest edition of the [MUTCD] for Streets and Highways supplemented to the extent applicable by State standards.") Because the Defendant was aware that there were no markings on the street, the Plaintiff argues that the Defendant was in breach of its duty. (*See* Blaschke Dep. 53:20–54:17, 97:5–99:11; Pl.'s Resp. 23–24.)

Assuming that the Defendant did have a duty to paint pavement markings on the roadway, the parties dispute whether the lack of markings caused the Plaintiff's accident. A plaintiff "must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the defendant's conduct was a substantial factor in bringing about the injury complained of." *Collins v. Am. Optometric Ass'n*, 693 F.2d 636, 640 (7th Cir. 1982). The Plaintiff asserts that the lack of markings caused the accident, because something like "R x R" painted would have given Mr. Brown a "clear point of reference" and helped him stop sooner. (Pl.'s Resp. 22–23.) The Defendant argues that the absence of pavement markings was not the cause-in-fact of Mr. Brown driving onto the tracks. Mr. Brown stated that he would drive over the High Street crossing "once a week, once every other week, at least," from either direction, "[b]oth at daytime and at night." (R. Brown Dep. 20:21–21:5, ECF No. 80-2.)[7] He had "seen

---

[7] The accident occurred at about 11:20 a.m., when it was daylight out.

trains at that intersection before" and had "never really had any problems" crossing the intersection before the date of the accident. (*Id.* 21:7–8, 21:15–19.) Any additional visual evidence, the Defendant argues, would not have supplied Mr. Brown with information he did not already possess.

The Court agrees with the Defendant. *Fifth Third Bank v. CSX Corp.*, 306 F. Supp. 2d 841 (N.D. Ind. 2004), is analogous to this dispute. In *Fifth Third Bank*, the Bechards collided with a train at a grade crossing and subsequently sued for failure "to maintain adequate protections and warning" at the crossing. *Id.* at 844. On the issue of causation, the court stated that

> Ms. Bechard testified that she observed signs indicating that she was approaching a railroad crossing and further testified that she was familiar with the particular crossing at issue in this matter. Such testimony tends to show that any absence of pavement markings was not the proximate cause of the Bechards' injuries. While Ms. Bechard's testimony has been called into question, the record is wholly lacking any basis from which to conclude that . . . alleged failure to maintain pavement markings was the proximate cause or even significantly contributed to this accident.

*Id.* at 847. Mr. Brown's deposition testimony mirrors that of Ms. Bechard's in *Fifth Third Bank*, as it "tends to show that any absence of pavement markings was not the proximate cause" of the High Street crossing accident. *Id.* Although the Plaintiff references two of its experts in this portion of his Response brief (Pl.'s Resp. 21–23), neither Mr. Loumiet's or Ms. Francis's Report actually discussed the lack of pavement markings as a cause of the accident. The Plaintiff has offered no evidence upon which a trier of fact may infer that, but for the lack of pavement markings, the accident would not have occurred.

Accordingly, the Defendant is entitled to judgment as a matter of law on the Plaintiff's theory that the Defendant is liable because it did not paint pavement markings.

**3.** *Excessive Speeding*

The Plaintiff asserts that the Defendant's employees were not reasonably operating the train at the time of the accident because the train was traveling at an excessive speed, the train's crew failed to "slow or stop to avoid a specific individual hazard," and they failed to keep a proper lookout for approaching vehicles. (Pl.'s Resp. 24–28.)[8] The Defendant maintains that federal preemption applies to the excessive speeding argument, and that its employees were otherwise acting reasonably.

a.    *Federal Preemption*

Federal regulations establish "maximum allowable operating speeds" for trains depending upon the class of track on which they are traveling. *See* 49 C.F.R. § 213.9. These federal speed limits preempt any state causes of action based on a train's allegedly excessive speed. *Easterwood*, 507 U.S. at 673–75.  Here, the Defendant's train was traveling on a Class 4 track. (Hall Decl. ¶ 6, ECF No. 80-9.) Under the regulations, the maximum allowable operating speed for a freight train on a Class 4 track is 60 miles per hour. 49 C.F.R. § 213.9(a). The Defendant offered evidence that the train was traveling within the maximum allowable operating speed as it approached the High Street crossing (Hall Decl. ¶¶ 3–6), and the Plaintiff did not dispute this fact in his briefing.[9] Accordingly, any claim that the Defendant "was negligent in operating its passenger train at a speed too fast for conditions" is preempted by federal law. (Compl. ¶ 10.)

---

[8] The Plaintiff separately moved for partial summary judgment on these grounds, based on the conduct of the Defendant's employees.
[9] Data printouts from the Defendant's lead and second locomotives show that the train's miles per hour dropped rapidly from 53 miles per hour to zero between 11:19:00 to 11:19:54, approximately when the accident occurred. (Hall Decl. Exs. 1–2.)

b.      *Related Tort Law Duties*

To get around federal preemption, the Plaintiff claims that the Defendant had a duty "to keep a proper lookout and to slow or stop a train to avoid a specific individual hazard." *Woods v. CSX Transp., Inc.*, Nos. 2:07-CV-29, 2:07-CV-30, 2008 WL 5070352, at *6 (N.D. Ind. Nov. 24, 2008); *Anderson v. Wis. Cent. Transp. Co.*, 327 F. Supp. 2d 969, 975 (E.D. Wis. 2004); *see also Easterwood*, 507 U.S. at 675 n.15 (declining to address the "FRSA's preemptive effect on" claims for "breach of related tort law duties, such as the duty to slow or stop a train to avoid a specific, individual hazard"). Under Indiana law, a train crew has no duty to reduce the train's speed upon seeing an automobile approaching the track because the crew may assume that such automobiles will yield the right of way. *Beal v. Nat'l R.R. Passenger*, No. 2:04-CV-250, 2006 WL 2095239, at *4 (N.D. Ind. July 27, 2006); *Ohio & Miss. Ry. Co. v. Walker*, 15 N.E. 234, 237 (Ind. 1888). However, a duty arises once a "transient condition pos[es] a hazard that could lead to a particular accident." *Woods*, 2008 WL 5070352, at *7. "Generally speaking . . . a specific, individual hazard is a person, vehicle, obstruction, object or event which is not a fixed condition or feature of a crossing and cannot be addressed by a uniform, national standard." *Id.* at *6 (quoting *Anderson,* 327 F. Supp. 2d at 978); *see also Beal*, 2006 WL 2095239, at *4 ("[T]he unwavering approach of a vehicle is a specific, individual hazard.") (internal quotation marks omitted).

The Defendant argues that its Engineer's testimony shows that the crew did not breach their duty to maintain a proper lookout. Engineer Coak stated that he observed Mr. Brown's vehicle to the east (to the left) of the shed-structure, and that it appeared to be traveling slowly.

(Coak Dep. 10:21–11:2, 24:3–18, ECF No. 78-8.)[10] Approximately three seconds elapsed

between Engineer Coak's first sighting of Mr. Brown's vehicle and the second time, when it was

on the west side (to the right) of the shed-structure, at which point he still expected the car to

stop short of the tracks. (*Id.* 13:1–11, 27:24–28:8.) According to Engineer Coak, another three to

four seconds passed between the second sighting of the vehicle and its impact with the train. (*Id.*

13:21–14:17, 28:9–12.) "And it was pretty simultaneous between" him applying the "brake and

impact." (*Id.* 13:1–5.)

But the Plaintiff offers the opinion of one of his experts to argue that it would have been

impossible for Engineer Coak to see Mr. Brown, based upon the former's vantage point in the

locomotive. (Fulk Report 7–11, ECF No. 78-10.) Furthermore, the Plaintiff argues that

Conductor Barnes was "looking down for the split second" to consider a "Slow Order" and never

saw Mr. Brown's vehicle traveling on High Street before the impact, despite being in a better

position given his seat in the locomotive. (Barnes Dep. 15:7–25, ECF No. 78-7.) Thus, none of

the members of the train crew were watching for Mr. Brown's vehicle as they approached High

Street and were in breach of their duty to keep a lookout. This dispute between the parties over

Engineer Coak's testimony, coupled with the other evidence introduced by the Plaintiff,

sufficiently raises a triable issue of fact as to whether the train crew breached its duty when

approaching the High Street crossing to maintain a proper lookout.

Next is the issue of whether the crew's breach proximately caused the accident at the

High Street crossing. To determine "whether an act is a proximate cause of an injury," a court

must "consider whether the injury was a natural and probable consequence of the negligent act,

---

[10] A dispute exists between the parties' experts as to whether Mr. Brown's vehicle was actually visible on High Street on the east side of the obstructing building, but it is not material to the overall issue.

which, in light of attending circumstances, could have been reasonably foreseen." *J.B. Hunt Transp., Inc.*, 58 N.E.3d at 972; *see also Control Techniques, Inc. v. Johnson*, 762 N.E.2d 104, 108 (Ind. 2002) ("Whether or not proximate cause exists is primarily a question of foreseeability.").

All that the Plaintiff offers in support are his expert's opinions:

> It is my opinion had conductor Barnes been looking he would have realized that the vehicle was coming onto the tracks and the crew must take preventive measures, i.e., brake application and/or a staccato type horn blast.
>
> ***
>
> Engineer Coak had the ability, should he have been maintaining proper watch, to have been placed on notice to reduce throttle or apply the emergency brake, to sufficiently enable the vehicle to have crossed the track and avoid the collision.

(Fulk Report 10.) The Defendant's expert clarified what this would have required. At the time that he was crossing the tracks, Mr. Brown "was traveling approximately 5.5 MPH. It took Mr. Brown's vehicle approximately 0.6 seconds to travel the distance between the rails (60 inches or 5 feet)." (Wolf Decl. ¶ 15, ECF No. 80-8.) The train collided "approximately 3.43 feet from the rear end of Mr. Brown's vehicle." (*Id.* ¶ 16.) In order "to safely clear the envelope of the oncoming train," Mr. Brown's car would have "needed to move forward approximately 8.43 feet" in total, which would have taken him an additional 1.04 seconds while traveling at the same 5.5 MPH. (*Id.*)

> In order to delay the arrival of the train by approximately 1.04 seconds, it would have required the train crew to begin emergency braking approximately 1,425 feet in advance of the crossing. When the train was 1,425 feet from the crossing, both the train and Mr. Brown's vehicle were approximately 18 seconds away from impact.

(*Id.* ¶ 17.) And the locomotive was only 528 feet from the crossing at the time that Engineer Coak stated he first saw Mr. Brown's car on the east side of the obstructing building. (*Id.* ¶ 18.)

It would have been impossible to avoid the collision even if the train crew began emergency braking the moment they spotted Mr. Brown's car.

Accepting this impossibility, the Plaintiff hypothesizes that Mr. Brown could have also increased his speed, rather than continuing to drive at 5.5 miles per hour. (Pl.'s Resp. 27–28.) Conjectural arguments unsupported by affidavits "cannot be given any weight" on summary judgment. *In re Matter of Morris Paint & Varnish Co.*, 773 F.2d 130, 134 (7th Cir. 1985). By merely hypothesizing, the Plaintiff ignores his real burden at this stage, which is to "produce evidence that, had the engineer not breached his duty" to keep a proper lookout, the accident "would not have occurred." *Beal v. Nat'l R.R. Passenger*, No. 2:04-CV-250, 2007 WL 951895, at *3–4 (N.D. Ind. Mar. 26, 2007); *Liboy ex rel. Liboy v. Rogero ex rel. Rogero*, 363 F. Supp. 2d 1332, 1341 (M.D. Fla. 2005) (finding insufficient evidence that a "car was stopped on the track" and "was stopped there for a period of time sufficient for [the crew] to apply the train's emergency brakes and slow the train to a non-lethal speed"). Indeed, there is no evidence that the train crew's failure to keep a vigilant lookout caused the accident, and thus no triable issues of fact as to proximate causation.

Accordingly, the Defendant is entitled to judgment as a matter of law on the Plaintiff's theory of liability premised on excessive speeding.

**4.    *Sounding of the Horn***

a.    *Federal Preemption*

Federal regulations require the "[s]ounding of the locomotive horn with two long blasts, one short blast and one long blast" when the "locomotive or lead cab car is approaching a public highway-rail grade crossing." 49 C.F.R. § 222.21(a). In terms of timing, "the locomotive horn

shall begin to be sounded at least 15 seconds, but no more than 20 seconds, before the locomotive enters the crossing." *Id.* § 222.21(b)(2).[11] Like those discussed above, this regulation "preempts any State law, rule, regulation, or order governing the sounding of the locomotive horn at public highway-rail grade crossings." 49 C.F.R. § 222.7(a). The Defendant offered evidence that Engineer Coak sounded the train's horn in the following sequence:

> At 12.1 seconds before the crossing, the horn sounded for 1.2 seconds
> At 9.1 seconds before the crossing, the horn sounded for 1.8 seconds
> At 6.8 seconds before the crossing, the horn sounded for 0.1 seconds
> At 6.2 seconds before the crossing, the horn sounded for 1.0 seconds
> At 4.0 seconds before the crossing, the horn sounded for 3.0 seconds

(Brach Decl. ¶ 9.) The Plaintiff presses three separate arguments as to how this horn sounding sequence constituted negligence and caused the accident. First, the Plaintiff argues that the horn sounding failed to comply with the regulations because it started less than 15 seconds before the train entered the crossing. Based on the evidence, "a jury could find that the sounding of the horn was out of compliance with the regulation." *Eubanks v. Norfolk S. Ry. Co.*, 875 F. Supp. 2d 896, 904 (N.D. Ind. 2012). The federal regulations impose a duty upon train crews as to when they must sound their horn, and the Defendant concedes that the failure to follow that regulation would constitute breach. However, while a claim based upon that breach is not preempted, the Plaintiff still must prove that the Defendant's breach caused the accident. *See id.* (first citing *Daub v. Daub*, 629 N.E.2d 873, 877 (Ind. Ct. App. 1994); then citing *Topp v. Leffers*, 838 N.E.2d 1027, 1032 (Ind. Ct. App. 2005) (requiring a "reasonable connection between a defendant's conduct and the damages which a plaintiff suffered")).

---

[11] There is no violation of the federal regulations if "acting in good faith, a locomotive engineer begins sounding the locomotive horn not more than 25 seconds before the locomotive enters the crossing" and "is unable to precisely estimate the time of arrival of the train at the crossing for whatever reason." *Id.*

Second, the Plaintiff argues that "the total warning horn duration issued was 7.1 seconds, less than half of the required duration (15-20 seconds)." (Pl.'s Resp. 29.) This argument ignores the plain meaning of 49 C.F.R. §§ 222.21(a) and (b)(1)(2). When inquiring as to the proper interpretation of a regulation, a court should ask "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute, . . . determined by reference to the language itself, the specific context in which that language is used, and the broader context" of the whole scheme. *Ioffe v. Skokie Motor Sales, Inc.*, 414 F.3d 708, 710–11 (7th Cir. 2005) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). Even though section (a), which sets out the sequence for sounding the horn, precedes section (b)(2), which sets out where and for how long the horn must sound, their meaning is "plain and unambiguous" only when read in conjunction. "The locomotive horn shall begin to be sounded at least 15 seconds, but no more than 20 seconds, before the locomotive enters the crossing" and be "in a pattern of two long blasts, one short blast, and one long blast . . . [that] shall be prolonged or repeated until the locomotive occupies the crossing." 49 C.F.R. §§ 222.21(a), (b)(1)(2).

Further, the regulation "does not define 'long blast' or 'short blast,' nor does it impose specific time requirements for long and short blasts." *Byrne v. CSX Transp., Inc.*, No. 3:09 CV 919, 2012 WL 1965781, at *2 (N.D. Ohio May 31, 2012). In *Byrne*, the train crew complied with the regulations when their first horn blast "lasted for a total of one second," "second horn blast lasted for two seconds, "third blast lasted for a total of .9 seconds," and "final blast lasted 4.6 seconds," even though the blasts lasted only 8.5 seconds *in total*. *Id.* Indeed, the agency's interim final rule counseled against "strict time requirements for the sound pattern" because they "would impose unrealistic limits on engineers and add to their already full workload." Use of Locomotive Horns at Highway-Rail Grade Crossings, 68 Fed. Reg. 70586-01, 70626 (proposed

Dec. 18, 2003) (codified at 49 C.F.R. §§ 222, 229). When a federal agency affirmatively exercises its full authority in "the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute, States are not permitted to use their police power to enact such a regulation." *Ray v. Atl. Richfield Co.*, 435 U.S. 151, 178 (1978). Thus, the argument that the Defendant's horn did not comply with federal regulations because its total duration was only 7.1 seconds misreads the regulation and its context, and misunderstands case precedent: 15–20 seconds denotes the *time at which* the horn must commence before the crossing, not the *total duration* for which the horn must sound.[12]

Third, the Plaintiff argues that the horn's signal did not meet the decibel (dB(A)) requirements under the federal regulations. "Each lead locomotive shall be equipped with a locomotive horn that produces a minimum sound level of 96 dB(A) and a maximum sound level of 110 dB(A) at 100 feet forward of the locomotive in its direction of travel." 49 C.F.R. § 229.129. The Defendant submitted evidence that four days after the accident, it "tested the sound output from the horn" on the locomotive, which was the same horn on the same locomotive involved in the accident. (Lynch Decl. ¶ 4, ECF No. 80-11.) The testing "was conducted in accordance with the requirements of 49 C.F.R. § 229.129." (*Id.* ¶ 5, Ex. 2.)[13] After performing the tests, the decibel "level . . . of the train's horn was found to be 102.52 dB(A) at

---

[12] Relatedly, the Plaintiff asserts negligence because Engineer Coak violated the Defendant's "training and procedures . . . by failing to sound the train horn at least 15 seconds prior to the crossing" and "by failing to sound the horn in a proper pattern." (Pl.'s Resp. 37.) The Court notes that any argument that the horn blast should have been sounded for a longer duration or in a different sequence other than the "Long–Long–Short–Long" required by the regulations is preempted under federal law. *Eubanks*, 875 F. Supp. 2d at 905 (citing 49 C.F.R. § 222.21(a)) (holding that a plaintiff's "further assertion that the engineer should have sounded a series of short blasts instead of the long blast [wa]s superseded by federal regulation which require[d] the long blast on approaching and entering an intersection").

[13] The Court's review of the "Test Parameters" listed in Exhibit 2, attached to the Lynch Declaration, confirm that the test followed the specific procedures outlined in the federal regulations. *See* 49 C.F.R. § 229.129(c)(1)–(10).

100 feet." (*Id.*)[14] Agreeing that this evidence showed the horn "in accordance with federal regulations" (Pl.'s Resp. 29), the Plaintiff instead focuses on multiple eyewitnesses who could not hear the horn right before or at the point of impact to argue that preemption is inapplicable (*see, e.g.*, A. Brown Dep., ECF No. 78-6; R. Brown Dep.; Wilson Dep., ECF No. 78-4). But it is irrelevant whether a bystander heard a horn when tests show that the horn complied with the federally mandated decibel level, and the cases that the Plaintiff cites to do not counsel otherwise. *See Murrey v. United States*, 73 F.3d 1448, 1451 (7th Cir. 1996) (discussing negligence claims generally, without mentioning federal preemption); *Anderson*, 327 F. Supp. 2d at 980 ("A state law claim alleging that a train's horn is inadequate is preempted" if it complies with applicable federal regulations).

Also, the Plaintiff misses the mark in claiming that "the horn must issue at the appropriate decibel level to provide adequate audible warning to oncoming drivers in the proper sequencing of long, long, short, long" for preemption. (Pl.'s Resp. 30.) The Plaintiff's expert audiologist claimed that it would take "between one and two seconds" for the locomotive's horn to reach its maximum decibel level. (Seidemann Dep. 54:10–21, 115:17–116:14, ECF No. 78-14.) Because only two of the Defendant's horn blasts in the sequence lasted for longer than one second, the Plaintiff argues that "only twice . . . did the horn decibel level" reach the level outlined under federal law, making preemption inappropriate. (Pl.'s Resp. 30.) But as the Court previously explained, the regulations only list "long blasts" and "short blasts"—they do not require the horn to sound for specific lengths of time. *See Byrne*, 2012 WL 1965781, at *2. The regulations are satisfied if the locomotive's horn "produces a minimum sound level of 96 dB(A)

---

[14] On September 14, 2011, the Defendant conducted another inspection, this time of "the locomotive's horn and bell, both of which were found to be in proper operating condition." (Lynch Decl. ¶ 3, Ex. 1.) This was not required under the federal regulations.

and a maximum sound level of 110 dB(A)" when it is measured in accordance with § 229.129(c). The Plaintiff's argument misreads the regulation's text and fails because the horn's decibel level was in compliance with the federal regulations. (Lynch Decl. ¶ 5, Ex. 2.) Any claim for negligence as a matter of law premised on the decibel level is preempted.

b.    *Causation*

So, the only cognizable theory left is the fact that the horn did not sound when the train was within 15–20 seconds of the High Street crossing. However, "[n]o reasonable jury could find on this record that the" failure to start sounding the horn at least two seconds earlier "would have changed the outcome of the accident." *Eubanks*, 875 F. Supp. 2d at 904;[15] *see also Petre v. Norfolk S. Ry. Co.*, 458 F. Supp. 2d 518, 535 (N.D. Ohio 2006) (finding same). The evidence shows that eyewitnesses either did not hear the locomotive's horn (A. Brown Dep. 52:21–53:11; Wilson Dep.), "might have seemed to have heard it" but "just right at the last split second," (R. Brown Dep. 37:4–8), or heard the last two blasts but could not remember hearing the earlier ones (Wilson Dep. 19:6–24, 20:7–12).[16] Additionally, the Plaintiff's expert audiologist stated that the horn was not loud enough for Mr. Brown to have heard it "in the final ten seconds before the crash." (Seidemann Dep. 64:24–65:11.) Such evidence tends to show that the failure to sound the horn two seconds earlier was not a cause-in-fact of the accident. If most of the eyewitnesses had

---

[15] The Plaintiff argues that *Eubanks* provides a different test for causation—"could a reasonable jury conclude that if a horn was blown properly in both sequence and duration, so as to reach the proper decibel level, would that have offered Rodney Brown sufficient time to avoid the collision?" (Pl.'s Resp. 32.) *Eubanks* did not change the applicable test for causation, as that court asked if "the harm would not have occurred 'but for' the defendant's conduct." 875 F. Supp. 2d at 909 (quoting *Daub*, 629 N.E.2d at 877).

[16] Contradicting himself, the Plaintiff also argues that "the testimony of one who was near a crossing and in a situation to have heard the whistle but did not hear it is sufficient to support an inference that a warning was not given." *Smith v. Chesapeake & Ohio R.R. Co.*, 311 N.E.2d 462, 467 (Ind. Ct. App. 1974). It escapes the Court how *Smith* is at all relevant, as both parties *agree* that the train crew gave a warning (Pl.'s Resp. 28–29; Mem. in Supp. of Def.'s Mot. Partial Summ. J. 21–22, ECF No. 80.) Their dispute is about whether the blasts were sounded *long enough* to provide adequate warning.

trouble hearing the horn with the locomotive 10 seconds from the High Street crossing, and none heard its initial horn 13 seconds away, then it would have made no difference to sound the horn when the train was 15 seconds away.

As such, there is no evidence that the train crew's noncompliance with federal regulations by sounding the horn less than 15 seconds from the crossing caused the accident, and thus no triable issues of fact as to proximate causation. Accordingly, the Defendant is entitled to judgment as a matter of law on the Plaintiff's theory of liability premised on the sounding of the horn.

5. **Obstructed View**

At the time of the accident, Indiana law required that:

> Each railroad in the State of Indiana shall maintain each public crossing under its control in such a manner that the operator of any licensed motor vehicle has an unobstructed view for fifteen hundred (1,500) feet in both directions along the railroad right-of-way subject only to terrain elevations or depressions, track curvature, or permanent improvements.

Ind. Code § 8-6-7.6-1.[17] Under the Seventh Circuit's interpretation of this statute, a "motorist must have the mandated view at the point where the highway intersects the edge of the railroad right of way." *Menke v. S. Ry. Company*, 603 F.2d 1281, 1283–84 (7th Cir. 1979); *Fifth Third Bank*, 306 F. Supp. 2d at 853. The law "obligate[s] the railroads to remove (subject to certain exceptions) all foliage and obstructions on the right of way which might impair a motorist's view

---

[17] Effective July 1, 2016, this statute was repealed, Bureau of Motor Vehicles Omnibus Bill, Pub. L. 198-2016, § 63 (Mar. 24, 2016), and newly enacted provisions govern a railroad's duty to maintain an unobstructed view at a public rail-highway grade crossing, *see* Ind. Code §§ 8-6-7.6-3 to -4. Now, a railroad must provide either 250 feet, 350 feet, 650 feet, or 900 feet of unobstructed view, depending upon whether the crossing's warning device is "passive" or "train activated" and what the "maximum authorized speed limit" is on the track. *Id.* § 8-6-7.6-3(1)(A)–(C), (2). The Court applies the law at the time of the events giving rise to the underlying claim.

of an oncoming train." *Cottrell v. Norfolk S. Corp.*, No. 3:05-CV-1, 2007 WL 1169693, at *3 (S.D. Ind. Apr. 18, 2007) (quoting *Menke*, 603 F.2d at 1284).

Based upon a Map [ECF No. 75] filed with the Court, the Defendant owned the right-of-way at the High Street crossing, which extended "20 feet east more or less and 165 feet west of the centerline of its single mainline track." (Hart Decl. ¶¶ 3–5, ECF No. 80-6.) The Plaintiff offers no evidence in dispute of this defined right-of-way, so the Court accepts that for purposes of summary judgment. However, the Plaintiff argues that three separate impediments in the northeast quadrant at the High Street crossing—a shed structure, trees/vegetation, and a signal box—were all on the Defendant's right-of-way and obstructed Mr. Brown's view in violation of Indiana law.[18] The Defendant offers two arguments in rebuttal of the Plaintiff's contentions.

First, pointing to *Menke*, the Defendant argues that "the railroad can only be held responsible for obstructions within its control," as that court approved of a jury instruction that "a railroad has no control over, and no responsibility for, obstructions of view which are located off the railroad right-of-way." 603 F.2d at 1284 & n.1 (internal quotation marks omitted). The Court agrees that this is a correct statement of the law. The Defendant offered evidence that the shed structure was not located on the railroad's right-of-way (Brach Decl. ¶¶ 5–6), and that it was not owned by the Defendant or otherwise under its control (Cauffman Decl. ¶ 6, ECF No. 80-7). The Plaintiff offered nothing to controvert this evidence. Therefore, the Court finds that the shed structure did not create § 8-6-7.6-1 liability for the Defendant.

As to the trees/vegetation, the Plaintiff alleges that at least one tree was "located approximately 120–130 feet north of the crossing" that extended "to within 20–25 feet of the east

---

[18] In the conclusion of his Response, the Plaintiff mentions a "telephone pole" as an obstruction. (Pl.'s Resp. 36.) However, he fails to designate any evidence that this existed, let alone was present at or near the crossing such that it obstructed Mr. Brown's view.

rail." (Pl.'s Resp. 34.) According to Mr. Brown's recollections and a screenshot from the locomotive's front-mounted RailView camera, the Plaintiff contends that such trees were "overgrown" and thus an obstruction. (App. in Supp. of Pl.'s Resp. ¶¶ 65–66.)[19] Even assuming that it was "overgrown," the Defendant once more has produced evidence that the tree was not located on its right-of-way or otherwise within its control. (Stovall Decl. ¶ 6; Hart Decl. ¶¶ 3–5; Brach Decl. ¶ 6.) Indeed, the Plaintiff conceded this point in arguing that the tree extended to "within 20–25 feet of the east rail," when the Defendant's right-of-way was "at most" 20 feet at that point. Therefore, the Court finds that the trees/vegetation did not create § 8-6-7.6-1 liability for the Defendant.

Second, the Defendant argues that a westbound motorist on High Street had an unobstructed view north (or to the right) down the tracks for 1,500 feet when 20 feet east of the near rail of the crossing. (Wolf Decl. ¶¶ 4–7.) This is relevant as to the signal box impediment, which was in the Defendant's control and located within its right-of-way. (Brach Decl. ¶ 4.) The Plaintiff introduced expert evidence that the signal box obstructed a driver's view north along the right-of-way as they were approaching the High Street crossing. This is because High Street skewed southward at the point it intersected with the crossing, which would skew a driver's sight line "by 26 degrees" in the direction opposite an oncoming train from the north and make their view *functionally* obstructed. (Francis Aff. Ex. B; Loumiet Aff. Ex. B.) Even if the Defendant's photographic evidence was uncontroverted, determining whether the view was "unobstructed"

_____

[19] Additionally, the Plaintiff argues that the Defendant removed these trees subsequent to the accident but before any photographs were taken. (Pl.'s Resp. 34.) He offers no evidence in support of this supposed subterfuge. The Defendant states that it "did not remove the trees located near the yellow metal building in the northeast quadrant of High Street . . . . Nor did [the Defendant] remove any trees east of [its] mainline track between High Street and . . . the next grade crossing to the north." (Stovall Decl. ¶ 5, ECF No. 87-5.) The Court finds the Plaintiff's argument to be without merit.

would involve weighing the Plaintiff's expert's evidence regarding a driver's line of sight. This is an inappropriate determination to make at summary judgment.

But that does not end the inquiry. The Defendant argues in the alternative that the signal box did not violate the statute because an unobstructed view is *subject to* "permanent improvements," Ind. Code § 8-6-7.6-1 (emphasis added), and the signal box qualifies as such. Black's Law Dictionary defines "improvement" as "[a]n addition to property, [usually] real estate, whether permanent or not; [especially], one that increases its value or utility or that enhances its appearance." *Improvement*, Black's Law Dictionary (10th ed. 2014). Indiana courts have cited Black's definition favorably when discussing that word in the context of a mechanic's lien statute:

> An improvement is some kind of valuable addition constituting more than mere repairs involving labor or capital, and is intended to enhance the property's value, beauty, utility, or to adapt it for new or further purposes. In that sense, the addition need not necessarily increase the market value of the property.

*Haimbaugh Landscaping, Inc. v. Jegen*, 653 N.E.2d 95, 102 n.18 (Ind. Ct. App. 1995); *see also John Wendt & Sons v. Edward C. Levy Co.*, 685 N.E.2d 183, 187 (Ind. Ct. App. 1997). The Court believes that the term "permanent improvement" contemplates an object like a signal box, as a signal box on a railroad's right-of-way most certainly increases the land's utility. Indeed, at least one Indiana court declined to hold a railroad negligent for "maintain[ing] buildings upon its right of way" because such buildings were "reasonably necessary for the prosecution of its business." *Evansville & Terre Haute R.R. Co. v. Clements*, 70 N.E. 554, 555 (Ind. App. Ct. 1904). Buildings are assuredly much greater of obstructions than signal boxes. To hold the Defendant liable under § 8-6-7.6-1 for placing its signal box on the right-of-way would contravene the plain text of that statute and frustrate its purpose, so the Court declines to do so.

Accordingly, the Defendant is entitled to judgment as a matter of law on the Plaintiff's theory of liability premised on an unobstructed view.

**B.     The Plaintiff's Motion for Partial Summary Judgment**

Many of those theories of liability that the Court discussed above were also raised in the Plaintiff's Motion for Partial Summary Judgment, and the Court subsumed them into its analysis. However, the Plaintiff moved for partial summary judgment on two additional grounds. First, the Plaintiff claimed that the warning lights used at the High Street crossing failed to comply with federal regulations, constituting negligence as a matter of law. Second, the Plaintiff sought summary judgment on the issue of damages, requesting $508,410 in economic damages for the wrongful deaths of Ms. Janero and her son.

**1.     *Warning Lights***

Federal law provides requirements for flashing lights at grade crossings. Relevant here, "[e]ach flashing light unit shall be properly positioned and aligned and shall be visible to a highway user approaching the crossing." 49 C.F.R. § 234.217(a). "A highway-rail grade crossing system shall be maintained to activate . . . , but in no event shall it provide less than 20 seconds warning time for the normal operation of through trains before the grade crossing is occupied by rail traffic." *Id.* § 234.225. Amendments to the FRSA in 2007 clarified that its preemption provision was not to "be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party . . . failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation." 49 U.S.C. § 20106(b)(A); *Nunez v. BNSF Ry. Co.*, 936 F. Supp. 2d 969, 976 (C.D. Ill. 2012), *aff'd* 730 F.3d 681 (7th Cir. 2013). However, those amendments left intact the

existence of federal preemption when "the *final authority to decide* what warning system is needed has been taken out of the railroad's and the state's hands." *Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1215 (10th Cir. 2008) (quoting *Armijo*, 87 F.3d at 1192).

The Plaintiff puts forth the former theory in moving for partial summary judgment. He argues that the flashers at the High Street crossing failed to comply with the applicable regulations set out in 49 C.F.R. §§ 234.217 and 234.225, constituting negligence as a matter of law. In support, the Plaintiff proffers multiple eyewitnesses to the accident who apparently did not see the flasher signal. In an analogous context, an eyewitness's negative testimony that they did not see or hear a whistle or bell is probative and admissible at summary judgment only if "(1) the witness [was] in a position to have seen the whistle or bell, and (2) the witness [was] attentive to the whistle or bell." *Mahoney v. Norfolk S. Ry. Co.*, No. IP00-0620-C-G/T, 2001 WL 1386086, at *4 (S.D. Ind. Sept. 19, 2001) (first citing *Wheat v. Balt. & Ohio R.R. Co.*, 262 F.2d 289, 293 (7th Cir. 1959); then citing *Bocock v. Wabash R.R. Co.*, 171 F.2d 834, 836 (7th Cir. 1949); then citing *Tr. Co. of Chi. v. Erie R.R. Co.*, 165 F.2d 806 (7th Cir. 1948); then citing *Stephenson v. Grand Trunk W. R.R. Co.*, 110 F.2d 401, 408 (7th Cir. 1940); last citing *Pere Marquette Ry. Co. v. Anderson*, 29 F.2d 479, 479–80 (7th Cir. 1928)). The Court believes that this test is equally applicable when the negative testimony relates to a flasher signal, as the probative value of an eyewitness's testimony rises or falls depending upon whether they were "in a position to have seen" and were "attentive" to the flasher signal.

Chief among the Plaintiff's proffered eyewitnesses is Mr. Brown. The relevant portion of his deposition testimony was as follows:

Q: Did you ever look to see if the flasher warning lights were operating as you approached?
A: Yeah, yes.
Q: And what did you see?

A: Nothing.
Q: Do you have a distinct, clear memory of actually looking up and seeing the
lights not on?
A: Oh, yes.
Q: They were not operating?
A: Oh, no.
Q: Are you certain of that?
A: I'm certain. If they did come on, . . . we were already past them.
Q: That would mean, by your account, that they malfunctioned?
A: Either that or they didn't turn on fast enough.

(R. Brown Dep. 37:23–38:15.) Applying the test articulated above, Mr. Brown's statement is

admissible for purposes of summary judgment. As the driver of the car at the accident, he was in

a position to have seen the flasher signal. Similarly, it is almost reflexive for a driver to be

attentive to whether or not certain signals or lights are flashing when driving, particularly before

proceeding into a railroad crossing.

Less clear were the observations of the Plaintiff's other eyewitnesses. Ms. Brown said "I

looked, but I didn't see anything. But that could have been from the sun." (A. Brown Dep.

28:11–12.) She acknowledged that she could not "say for sure" whether the flashers were on, and

also did not "hear the dinger at the crossing, the bell" despite one of the car's windows being

down. (*Id.* 28:16–23.) Conductor Barnes could not "make any observations of the flashers" or

"hear any of the bells and/or whistles" because "[i]t was too chaotic." (Barnes Dep. 45:25–

46:11.) Officer Mike Wilson, who was in a separate vehicle directly behind Mr. Brown's vehicle,

did not "remember seeing the flashers" because he did not "remember looking at them,"

although he did "remember hearing the horn of the train and the bells dinging . . . because of

[Mr. Brown's] vehicle being so close to the intersection and moving so slow." (Wilson Dep.

21:16–21.) Kim Wilson, Officer Wilson's wife, who also in his car, did not hear bells dinging or

see any flasher lights.[20] The Court finds that none of these eyewitnesses were in a position to have seen the flashers or were attentive enough to render their testimony probative as to the issue of the flashers' operation. "A finding that" the flasher signals were inoperative at the time of the accident "based upon [their] testimony could be the result only of speculation, surmise and conjecture." *Randall*, 800 N.E.2d at 959–60 (internal quotation marks omitted). Accordingly, none of the eyewitnesses are appropriate for consideration at summary judgment.

For its part, the Defendant introduced evidence that the flashers and bell at High Street were programmed to activate approximately 30 seconds before rail traffic occupied that crossing. (Ireton Dep. 52:6–19, ECF No. 87-17; Sharkey Decl. Ex. 2, ECF No. 87-18.) As the train arrived at the crossing, Engineer Coak stated that he "saw the flashers operating." (Coak Dep. 62:20–22.) Coak's eyewitness testimony is admissible because he was in a position to have seen the flashers and was attentive to them, given his earlier testimony. And immediately after the accident, the signal mast in the northeast quadrant—the flasher that Mr. Brown would have seen—was operating and flashing. (Sones Dep. 20:20–21:10, ECF No. 87-16.)

There exists a genuine issue of fact as to whether or not the flashers at High Street were *actually* operating during those 30 seconds prior to the accident, given the conflicting accounts from the Plaintiff's admissible eyewitness testimony and the Defendant's evidence. At this stage, the Court must avoid "the temptation to decide which party's version of the facts is more likely

---

[20] The Defendant moved to strike Ms. Wilson's handwritten statement as inadmissible hearsay. *See Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Ms. Wilson's statement was not offered as evidence regarding the flashers, but rather to prove that she heard the train horn immediately before the collision. (App. in Supp. of Pl.'s Mot. Partial Summ. J. ¶ 5, ECF No. 78.) Because the Court has already ruled that the Defendant was entitled to judgment as a matter of law on any theory of negligence involving the train's horn, the Defendant's Motion to Strike is rendered moot.

true," *Payne*, 337 F.3d at 770, and leave that determination for the jury. Accordingly, summary judgment as to the claim that the Defendant violated 49 C.F.R. § 234.225 is denied.[21]

### 2.    *Resultant Damages*

The Plaintiff moves this Court to find, as a matter of law, that he sustained economic damages in the amount of $508,410, based on Ms. Janero's future lost earnings and loss of household services. The Defendant contests the calculations behind that figure and also argues that they must be net of taxes. However, there has been no finding of liability in this case because "a multitude of factual issues and abstract concepts" predominate that theory of negligence that is best left for the jury to decide. *Gracyalny v. Westinghouse Elec. Corp.*, 723 F.2d 1311, 1316 (7th Cir. 1983). It would be premature for the Court to determine what, if any, damages are properly awardable in this case before any finding of liability. Accordingly, summary judgment as to the resultant damages in this case is denied.

### CONCLUSION

For the foregoing reasons, the Defendant's Motion for Partial Summary Judgment [ECF No. 73] is GRANTED and the Plaintiff's Motion for Partial Summary Judgment [ECF No. 76] is DENIED.

SO ORDERED on March 15, 2017.

s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT

---

[21] As the Defendant points out in its Response brief, none of the Plaintiff's designated evidence shows that the flasher signals at the High Street crossing were improperly positioned or placed. (*See* Def.'s Resp. to Pl.'s Mot. Partial Summ. J. 7 n.6, ECF No. 87.) Furthermore, the Defendant introduced evidence that the flasher signals were in compliance with the relevant federal regulations as to their positioning. (Sharkey Decl. Ex. 2.) Accordingly, the Plaintiff's claim for violation of 49 C.F.R. § 234.217(a) necessarily fails.